622 So.2d 991 (1993)
Ralph Kermit ELLIS, Appellant,
v.
STATE of Florida, Appellee.
No. 75813.
Supreme Court of Florida.
July 1, 1993.
Rehearing Denied September 3, 1993.
*993 Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Ralph Kermit Ellis appeals his convictions and death sentences for two first-degree murders and a thirty-year sentence for attempted murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In 1978, the City of Jacksonville experienced racial tension at Paxon High School. During this period of time, two black males  one of whom apparently was a student at Paxon  were found murdered in an broad area along U.S. Highway 1 in northern Jacksonville. Shortly thereafter, a third black male was attacked in the same general vicinity, but escaped after a struggle.
Jacksonville police records showed that the first victim, Willie Evans, had been found dead near U.S. Highway 1 on March 21, 1978. The second victim, Howard Mincey, had been found dead in the same general vicinity late in the evening of March 24, 1978. The third victim, Allen Reddick, had been attacked in the same area on July 7, 1978.
*994 These crimes remained unsolved for eleven years. Police briefly had detained and questioned Ellis, the appellant in the present case. However, no charges were filed against Ellis prior to 1989. At the time of the murders, Ellis was seventeen years old and a student at Paxon.
In early 1989, an Ocala resident named Cecil Phillips contacted law enforcement officers about the crimes. Phillips had graduated from Paxon in 1978 and was friends with both Ellis and a person named Johnny Boehm. Phillips told sheriff's deputies that he had become a Christian in recent years and no longer could live with the secret he had been harboring since the year he had graduated.
According to Phillips, Ellis had confessed to the crimes in 1978 and said that they were racially motivated. Ellis told Phillips that Boehm had actively assisted in planning and executing the attacks. The States' theory of the case treated both Ellis and Boehm as coperpetrators.
Ellis told Phillips that the crimes were conducted in a similar manner: All three of the black males had been lured into the cab of a truck under the pretense of giving them marijuana to smoke. In each crime, the black male was seated in the truck between Ellis and Boehm and then was attacked with knives. All three crimes occurred along U.S. Highway 1 in 1978.
However, Phillips' recollection of several details was wrong. Phillips recalled that the first murder was of an older black man near Imeson Road, when in fact the first murder was of a young black found near Plummer Road. The second murder was of an older black man found near Imeson. Phillips also testified that Ellis had shown him a wallet supposedly taken from the second murder victim, whom he identified as the young black. However, the mother of the young black  Evans  testified that her son had possessed only one wallet she knew of, which was still at her house after her son was murdered.
Phillips recalled once finding Ellis washing blood from his truck. Ellis had said the blood came from a black man whom he and Boehm had killed. Ellis also showed Phillips a club-like "tire checker" that had blood on it, which Ellis said came from the black victim.
After hearing Phillips' statements in 1989, law officers responded by interviewing persons who had attended Paxon High School in 1978. The officers found other classmates who recalled incidents in which Ellis had confessed to the attacks.
One classmate, Randy Mallaly, told officers about an incident in which he had driven around with Boehm and Ellis. At one point, Ellis told Mallaly, "We're going to kill a nigger." Ellis then allegedly brandished a sawed-off shotgun. Mallaly had indicated he did not want to be part of such an incident, and nothing happened at the time.
Later that same day, Mallaly said he had seen Ellis wiping blood off an instrument. Mallaly also saw blood on the seat of the truck. Ellis had explained that "he and Johnny [Boehm] had killed a nigger." According to Mallaly, Ellis then described the murder in terms substantially the same as the confession given to Phillips. Shortly before this incident, Mallaly said he had seen Boehm's vehicle driving away from the place where Ellis was cleaning the instrument.
Mallaly also told police that, later that same year, Ellis had told him of a second murder involving a black male victim.
Ellis also told Mallaly about a third incident in which Ellis and Boehm had attempted to kill a black male but had not succeeded because the man had struggled with them. During the struggle, Boehm accidentally cut Ellis with a knife. An emergency room doctor verified that he had treated Ellis on the same day the third incident had occurred along U.S. Highway 1.
Another person, Richard Feagle (the stepson of Boehm), gave a sworn statement to police that contained substantially the same information about the crimes. The statement linked Ellis to a murder on Plummer Road. In court, however, Feagle *995 recanted[1] and stated that his information had come from newspaper articles and Paxon High School gossip.[2] The court called Feagle as a court witness and the state, over a defense objection, impeached Feagle's testimony with his own prior sworn statement made under subpoena of the State Attorney.
Ellis took the stand in his own defense and testified that he had never committed the crimes. Ellis said there had been highschool rumors that he and Boehm had committed murder, but that these were not true. The cut on his arm was only an accident, said Ellis. There was evidence suggesting that Ellis had cultivated a "tough" image in high school, partly to prevent others from attacking him during the racial tensions of the time.
On December 8, 1989, the jury returned verdicts of guilty on all counts.
Prior to sentencing, the state dropped all charges against Boehm. The prosecutor explained that there was no direct or circumstantial evidence against Boehm other than Ellis' statements.
On December 15, 1989, the jury recommended a sentence of death by a vote of 8 to 4 on both murder counts. On March 2, 1990, the trial court imposed a sentence of death for each of the murder counts and a consecutive term of thirty years for the attempted murder count.
During the penalty phase, the state presented no case of its own. Ellis presented testimony: (a) that he was a good neighbor; (b) that he was a good father to his children and was very caring of them, and that his children loved him dearly; (c) that he is honest; (d) that he had a good reputation; (e) that he was a good, faithful, and dependable employee; (f) that he was a good and supportive husband to his wife; (g) that he was a well-liked friend; (h) that he was a hard-working man; (i) that he was a family man; (j) that he had caused no problems in jail; (k) that the murders occurred at a time when Paxon High School was full of racial strife and was a very violent place; (l) that his neighbors refused to believe he was guilty of the crimes; (m) that Ellis had no problem working with black people on the job and socialized with blacks quite well; (n) that he was good to his mother, father, brother, and sister; and (o) that Ellis has voluntarily turned himself in to the police. Several of the witnesses testifying for Ellis were law enforcement officers.
On cross examination, the state elicited testimony that Ellis had sometimes picked fights in high school and did not "back down" from a fight. On redirect, Ellis elicited testimony from one white witness that Paxon High School had become so racially violent in 1978 that the witness was beaten with a pipe by ten or eleven blacks for no reason.
On rebuttal, the state introduced evidence that Ellis was not a model prisoner because he had thrown urine on black inmates in the jail and had called them "niggers." On cross examination, Ellis introduced evidence that the black inmates had been harassing him, and that jail officials had to move him to an isolation cell for his own safety.
In the penalty phase, the State several times suggested that Ellis and Boehm were equal participants in the murder.
During the penalty instructions, the court told the jury it could consider nonstatutory mitigating evidence.
In its sentencing order, the trial court found the following aggravating circumstances: (a) previous conviction of a violent felony, specifically, any of the other crimes for which Ellis was convicted; (b) murder committed during the commission of a robbery (the taking of one of the victim's wallet) or a kidnapping; (c) the murders *996 were heinous, atrocious, or cruel; (d) the murders were cold, calculated, and premeditated.
The trial court's sentencing order does not expressly consider any nonstatutory mitigating evidence. In its preface to the pertinent portion of the order, the trial court states as follows:
The Court now analyzes each of the mitigating circumstances specified by the Legislature in Section 921.141(6), Florida Statutes (1989).
The court then listed each of the statutory mitigating factors. Of these, the court found only one: no significant history of prior criminal activity, as shown by the fact that Ellis had "been a model citizen" since 1978. The court expressly rejected Ellis' claim that his age at the time of the murder was mitigating because "[t]he actions and statements of the Defendant indicate a mature, but hate-filled, mind fully cognizant of his actions and responsibilities."
We find a few issues that are dispositive and merit discussion.

I. Feagle's Prior Inconsistent Statement
Ellis argues that it was error for the trial court to permit into evidence Feagle's prior statement. At first blush the statement appears to have constituted hearsay as defined in the Evidence Code, which declares that "hearsay" is
a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
§ 90.801(1)(c), Fla. Stat. (1989). The State raises alternative arguments on this point, the first being that Feagle's statement was properly admitted for purposes of impeachment under section 90.608, Florida Statutes (1989).[3] We cannot accept this argument, foremost because the State and the trial court themselves stated at trial that the prior statement was being admitted not to impeach but as substantive evidence. By definition, substantive evidence is that which tends to prove the truth of the matter asserted.[4]
Even if the State and trial court had not made these remarks, however, we would be forced to the same conclusion by the substance of what the State did. This was not simply an attack on Feagle's credibility. Rather, the State made an active effort to persuade the jury both to believe in the truthfulness of the out-of-court statements and to reject Feagle's in-court statements. In closing arguments the State even reiterated material from Feagle's out-of-court statement and emphasized that it was truthful and could be relied upon as evidence of Ellis' guilt.[5] Accordingly, the State was using the prior statement almost entirely for its substantive effect on the fact finder. At least to this extent, the hearsay rule must remain applicable. Feagle's earlier statement was hearsay and *997 therefore inadmissible in the absence of any other exception to or exclusion from the hearsay rule.
Alternatively, the State argues that Feagle's prior statement was excluded from the category of hearsay by operation of paragraph (a) of subsection 90.801(2), Florida Statutes (1989). The statute provides:
A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
(a) Inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition... .
Id. For purposes of the statute, the "declarant" is the person who makes a statement, § 90.801(1)(b), Fla. Stat. (1989); and a "statement" for present purposes is an oral or written assertion. § 90.801(1)(a)1., Fla. Stat. (1989).
Obviously, Feagle testified at trial, was subject to cross examination, and gave testimony inconsistent with an earlier statement. As a result of the inconsistency, Feagle subsequently has been prosecuted for perjury by inconsistent statements. See State v. Feagle, 604 So.2d 824 (Fla. 1st DCA 1991); State v. Feagle, 600 So.2d 1236 (Fla. 1st DCA 1992). However, it is clear that the earlier statement was not made at a trial, hearing, or deposition. Therefore, the only possible basis for the State's argument is that Feagle's prior statement was made in some "other proceeding."
In construing the meaning of this undefined term, we must begin by noting that the pertinent language was derived from the Federal Rules of Evidence. Thus, federal court decisions on the same question are persuasive in Florida. Moore v. State, 452 So.2d 559, 561-62 (Fla. 1984). We also note that our own courts already have developed a fairly substantial body of law on the subject as well.
It is clear, for example, that the term "other proceeding" encompasses grand jury hearings. United States v. Distler, 671 F.2d 954 (6th Cir.), cert. denied, 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 102 (1981); Moore. However, the courts have shown a marked unwillingness to include types of information-gathering activities less formal than a grand jury hearing or deposition. For example, the term "other proceeding" does not include police interrogations or statements obtained during police investigations, even if sworn, State v. Delgado-Santos, 497 So.2d 1199 (Fla. 1986), sworn statements made to defense counsel, Arner v. State, 459 So.2d 1136 (Fla. 4th DCA 1984), review denied, 471 So.2d 43 (Fla. 1985), interviews under oath by Internal Review Service officers, United States v. Day, 789 F.2d 1217 (6th Cir.1986), or sworn statements made to obtain a warrant. Kirkland v. State, 509 So.2d 1105 (Fla. 1987).
In Delgado-Santos and again in State v. Smith, 573 So.2d 306 (Fla. 1990), this Court conducted an extensive analysis of the history and purpose of paragraph (a) of subsection 90.801(2), Florida Statutes. We noted that the rule "was intended to be a very narrow provision" that cannot be construed liberally, but must be construed strictly. Id. at 314. To qualify under the rule, the statement must be made during a proceeding that is "no less formal than a deposition and no more so than a hearing." Id. (quoting Delgado-Santos v. State, 471 So.2d 74, 77 (Fla.App. 1985)). Moreover, an information-gathering process is not an "other proceeding" within the meaning of the rule unless it has a degree of formality, convention, structure, regularity, and replicability of the process in question. Id. at 314-15 (quoting Delgado-Santos, 471 So.2d at 77).
Thus, in Smith we found error under subsection 90.801(2), paragraph (a), where the court admitted into evidence the sworn statement of a witness made to a prosecutor and deputy sheriff in the presence of a court reporter. We gave the following rationale:
[The witness] was brought into a room where a deputy sheriff and a prosecutor were waiting with a court reporter to interrogate the seventeen-year-old about a homicide in which she had just been involved. No counsel was present to advise *998 her or to protect [the defendant's] interests; no cross-examination was possible; and no judge was present or made available to lend an air of fairness or objectivity. This prosecutorial interrogation was "neither regulated nor regularized," Delgado-Santos, 471 So.2d at 78; it contained "none of the safeguards involved in an appearance before a grand jury" and did not "even remotely resemble that process," id.; nor did it have any "quality of formality and convention which could arguably raise the interrogation to a dignity akin to that of a hearing or trial." Id. At bottom, prosecutorial interrogations such as the one here provide no "degree of formality, convention, structure, regularity and replicability of the process" that must be provided pursuant to the statute to allow any resulting statement to be used as substantive evidence to prove the truth of the matter asserted. Id. at 77.
Smith, 573 So.2d at 315-16.
The facts of the present case are in no meaningful way distinguishable from those in Smith. Here, Feagle was summoned by subpoena to appear before the prosecuting attorney; he was put under oath; and he was required to testify before a court reporter in a nonadversarial setting under the control and direction of the prosecutor and no one else. Many questions put to him were of a highly leading nature that would not have been a proper method of direct examination had the State called Feagle as its witness at trial. A large number of Feagle's statements are merely "yes" or "no" replies to detailed leading questions put by the State.
We might be inclined to view this error as harmless except for the peculiar facts of the case and the cumulative errors that occurred here (discussed more fully below). Most significantly, the prior statement of Feagle became a prominent feature of the trial. The prosecutor read at length from the statement and argued matters from it during closing argument, urging jurors to accept the prior inconsistent statement as truthful. For another, Feagle's prior statement was perhaps one of the strongest corroborations of Ellis' alleged involvement in the murder of Evans, even to the point of identifying the road along which Evans' body was found. Any confession is damning evidence; and the purported confession by Ellis described and later retracted by Feagle was not merely cumulative of other admissible evidence. To the contrary, it contained important details absent from the other evidence, and it tended to give substantial weight to the case against Ellis.[6]
It is entirely possible that a reasonable juror could have had reasonable doubts about the Evans murder that were dispelled by Feagle's prior inconsistent statement; and a belief that Ellis was guilty of the Evans murder could only have bolstered a belief in Ellis' guilt as to the other offenses. See Crossley v. State, 596 So.2d 447 (Fla. 1992). Whenever improper evidence becomes so prominent a feature of the trial, a court cannot find that the error was harmless beyond a reasonable doubt. In sum, there is a strong likelihood here that the improper admission of Feagle's prior statement affected the outcome of the proceeding. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). On this basis alone we must reverse.

II. Joinder
The second issue we address concerns the joinder of the three counts against Ellis in a single trial. Under Florida Rule of Criminal Procedure 3.150(a),
[t]wo or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses ... are based on the same act *999 or transaction or on 2 or more connected acts or transactions.
In Wright v. State, 586 So.2d 1024 (Fla. 1991), we held that offenses are "connected acts or transactions" within the meaning of the Rule if they occurred within a single episode. Thus,
"the rules do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are `connected' only by similar circumstances and the accused's alleged guilt in both or all instances." Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence.
Id. at 1029-30 (citations omitted) (quoting Garcia v. State, 568 So.2d 896, 899 (Fla. 1990)). Moreover, even where joinder is otherwise proper, a defendant is entitled to have separate trials upon a showing that severance is "necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." Fotopoulos v. State, 608 So.2d 784, 790 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993).
In Crossley, 596 So.2d at 449-50 (citations omitted), we further stated:
The justifications for the consolidation of charges are convenience and the preservation of the courts' valuable resources. However, practicality and efficiency cannot outweigh the defendant's right to a fair trial. The danger in improper consolidation lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other. While the testimony in one case standing alone may be insufficient to convince a jury of the defendant's guilt, evidence that the defendant may also have committed another crime can have the effect of tipping the scales. Therefore, the court must be careful that there is a meaningful relationship between the charges of two separate crimes before permitting them to be tried together.
It is significant that Crossley expressly weighed a variety of factors in determining whether or not the two crimes of robbery at issue there were part of a single "episode." On one hand, the Crossley crimes were temporally and geographically close to one another, because they were separated by less than three hours in time and only two or three miles in distance. Likewise, both offenses involved an armed robbery of a woman in a commercial establishment by a black man wearing a cap, dark sunglasses, a blue shirt or jacket, and gray shorts. On the other hand, one of the crimes involved a kidnapping, while the other did not. But most importantly the Court found that "the two episodes were entirely independent" and that "there was absolutely nothing to connect one crime with the other." Crossley, 596 So.2d at 450.
This analysis is further illuminated by the opinion in Bundy v. State, 455 So.2d 330 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986). There we confronted a situation in which serial killer Ted Bundy had gone on a murderous ramPage in the housing facilities near Florida State University in Tallahassee. Bundy first attacked four women, killing two, in the Chi Omega sorority house near the university; then within roughly an hour Bundy proceeded to a duplex apartment a few blocks away and attacked a fifth woman. Id. at 334-35. Thus, in Bundy we confronted a classic example of an uninterrupted crime spree in which no significant period of respite separated the multiple crimes. As such, the crimes were connected and constituted a single uninterrupted episode.
Our recent opinion in Fotopoulos also sheds light on the proper standard for joinder. There we addressed a case in which the defendant first induced a woman under his influence to shoot and kill a man while he videotaped the crime. Fotopoulos then used the video tape as blackmail to induce the woman to hire a "hit man" to murder Fotopoulos' wife about one month later. *1000 While there was a substantial lapse of time in Fotopoulos, it was clear that the two crimes were linked in a causal sense: One was used to induce the other. That causal link was sufficient to permit joinder, since one crime could not properly be understood without the other. Fotopoulos, 608 So.2d at 790. In sum, the two crimes Fotopoulos helped commit constituted a single episode because of their obvious causal link and despite a lapse of time greater than in Bundy or Crossley.
There are several rules that can be distilled from these earlier cases. First, for joinder to be appropriate the crimes in question must be linked in some significant way. This can include the fact that they occurred during a "spree" interrupted by no significant period of respite, Bundy, or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time. Fotopoulos. But the mere fact of a general temporal and geographic proximity is not sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes. Crossley.
The present case is different from each of these earlier cases, so we must consider where on the spectrum it falls. First, there is a substantially greater lapse of time between the crimes at issue here than there was in Crossley or Bundy: three days between the Mincey and Evans murders, and several months later until the attempted murder of Reddick. The lapse of time until the Reddick attack also was greater than that at issue in Fotopoulos, but it is clear that the amount of time in Fotopoulos was not dispositive solely because of the causal link between the crimes. There is no such link here, because each of Ellis' alleged crimes was freestanding and distinct. None was a causative link in the commission of the other crimes. It is true that Ellis' alleged crimes are similar, but this alone is insufficient to warrant joinder. Wright. Finally, while the alleged actions of Ellis might loosely be called a "spree," they are not so in the sense contemplated in Bundy. Here, each crime was interrupted by a significant period of respite, several months in the case of the Reddick attack.
On the whole we find that these facts militate against joinder. This case far more closely resembles the situation described in Crossley than those in Bundy and Fotopoulos. As a result, the trial court erred in joining the three counts.
Had the joinder error been the sole reason for reversal we now would be required to conduct a harmless error analysis. See Crossley, 596 So.2d at 450. However, because we also must reverse on separate grounds, the question of harmlessness is moot. The trial court obviously will be constrained to abide by the dictates of our analysis above, since the error  even if harmless  must be corrected now that a new trial is required on an independent basis. Once a trial court is apprised of error in a case that must be reversed on other grounds, the trial court is not free to commit the same error again on remand, even if that error might otherwise have been considered harmless in an initial trial. We therefore do not address the question of harmlessness. On remand each of the three counts against Ellis shall be severed in accordance with this opinion and Florida law.

III. Other Instructions on Remand
For the instruction of the court and parties below, we must address a few remaining matters. The record reflects several additional errors that must be avoided on remand.

A. The Robinson Testimony
First, we believe that the testimony of Officer Frederick Robinson that Ellis was popular at school because of his hatred of blacks was irrelevant, inflammatory, and an impermissible comment on character. §§ 90.403, 90.404(1), Fla. Stat. (1989). This error standing alone probably would have been harmless, but the other errors in the case require reversal. The trial court accordingly shall not permit the error to occur again, harmless or not.

*1001 B. Mitigating Evidence
Second, the trial court in any penalty phase on remand is directed to expressly find, consider, and weigh in its written sentencing order all mitigating evidence urged by Ellis, both statutory and nonstatutory, apparent anywhere on the record in keeping with the analysis developed by this Court in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), Campbell v. State, 571 So.2d 415 (Fla. 1990), Santos v. State, 591 So.2d 160 (Fla. 1991), and their progeny. The State, of course, shall be provided a full opportunity to rebut the existence of mitigating factors urged by Ellis and to introduce evidence tending to diminish their weight if they cannot be rebutted.

C. Age as a Mitigating Factor
Third, on the question of young age as a mitigating factor, we are gravely troubled by inconsistencies in Florida cases involving minors who commit murder. In such cases some courts find young age a mitigating factor and others reject the factor outright, as the court did here, based on the same or highly similar facts. On this issue, for example, the present case is indistinguishable from LeCroy v. State, 533 So.2d 750 (Fla. 1988), cert. denied, 492 U.S. 925, 109 S.Ct. 3262, 106 L.Ed.2d 607 (1989), where the trial court found the factor present as to the seventeen-year-old defendant in that case. However, based on the record before it, the LeCroy trial court then proceeded to note that the weight to be accorded to the factor was diminished by other evidence of LeCroy's unusual mental and emotional maturity.[7]
We believe the proper approach in cases involving murders committed by minors is that used in LeCroy. Whenever a murder is committed by one who at the time was a minor, the mitigating factor of age must be found and weighed, but the weight can be diminished by other evidence showing unusual maturity. It is the assignment of weight that falls within the trial court's discretion in such cases.
The reasons for this conclusion are self-evident. If any group was intended to be included within the statutory mitigating factor of age, it must be those who were minors at the time of the commission of their crimes. § 921.141(6)(g), Fla. Stat. (1989). If minors can be excluded, then a court effectively is given unbridled discretion to exclude everyone from the category. It is a fundamental rule of construction that statutory language cannot be construed so as to render it potentially meaningless, Snively Groves, Inc. v. Mayo, 135 Fla. 300, 184 So. 839 (1938), and nothing in the statute reflects any intention that a court should have discretion to render the statute applicable to no one at all. § 921.141(6)(g), Fla. Stat. (1989).
Any other holding would make the obvious mandate of the legislature subservient to the discretion of a court, leading to the inconsistent results we see in the cases on this issue, and to a violation of the separation of powers. Art. II, § 3, Fla. Const. On remand, the trial court shall find the factor of age in mitigation, but may reduce the weight accorded that factor to the extent there is admissible evidence that Ellis possessed unusual maturity at the time of his alleged crimes, assuming he is again convicted as before. LeCroy.

D. The Espinosa Issue
Finally, if on remand a new instruction is given for the aggravating factor of heinous, atrocious, or cruel, the trial court shall ensure that the instruction complies with Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), and its progeny if the defense so requests.[8]

*1002 IV. Conclusion

For the foregoing reasons, the convictions and sentences are reversed. The remaining issues raised by the parties are moot and will not now be addressed. This cause is remanded for new trial on all issues in full compliance with this opinion and any other applicable law.
It is so ordered.
OVERTON, McDONALD, SHAW, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs with an opinion.
BARKETT, C.J., concurs in result only.
KOGAN, Justice, concurring.
I fully concur with the majority as far as it goes but would address two further issues raised by Ellis. First, I agree with Ellis' argument that intervening federal case law most likely renders unconstitutional the retroactive application to him of the aggravating factor of cold, calculated premeditation. That factor was not added into the death penalty statute until more than a year after the two murders of which Ellis stands accused.
Although I realize we previously have rejected an ex post facto challenge in this same context, e.g., Justus v. State, 438 So.2d 358 (Fla. 1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984), I believe the intervening opinion in Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), renders our prior analysis highly questionable. Likewise, I cannot reconcile our earlier holdings with the Eleventh Circuit's analysis in Raske v. Martinez, 876 F.2d 1496 (11th Cir.), cert. denied, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989), nor with our own opinions in Waldrup v. Dugger, 562 So.2d 687 (Fla. 1990), or Dugger v. Williams, 593 So.2d 180 (Fla. 1991).
Thus, on the basis of the ex post facto clauses of the federal Constitution and article I, section 10 of the Florida Constitution, I would remand with instructions that cold, calculated premeditation is not a possible aggravating factor in this case. I also agree with Ellis that the holdings of Justus and similar cases cannot be squared with the plain language of article X, section 9 of the Florida Constitution.[9]
Second, I find persuasive Ellis' argument that this Court has misconstrued paragraph (b) of subsection 921.141(5), Florida Statutes (1989). The plain language of the paragraph states that the defendant must previously have been convicted of a prior violent felony before that fact can be used in aggravation. Because this is a penal statute, we are required to construe it strictly according to its letter. Perkins v. State, 576 So.2d 1310 (Fla. 1991). The statute nowhere states that contemporaneous felonies can be used in aggravation. Accordingly, I would recede from our precedent to the contrary and instruct the trial court on remand that the aggravator of prior violent felony may not be found in this case.
NOTES
[1] We do not use the words "recant" or "recantation" in the narrow legal sense associated with the "defense of recantation" applicable in perjury proceedings. We merely mean that Feagle later contended that his earlier statement was not correct.
[2] Feagle later was prosecuted for perjury. See State v. Feagle, 604 So.2d 824 (Fla. 1st DCA 1991); State v. Feagle, 600 So.2d 1236 (Fla. 1st DCA 1992).
[3] Impeachment's object is to attack the credibility of the witness. Where this genuinely is the predominant purpose of the questioning, then the evidence so introduced is not being admitted "to prove the truth of the matter asserted" but rather to show why the witness is not trustworthy. See § 90.801(1)(c), Fla. Stat. (1989).
[4] The following exchange occurred at trial:

[DEFENSE ATTORNEY:] It would be my understanding that any statements used to impeach [Feagle] would have to be accompanied by a [finding] from the Court that they come in as prior inconsistent statements, and not substantive evidence... .
[PROSECUTING ATTORNEY:] Judge, the statute has changed about whether it's for impeachment or substantive evidence. Since that case [sic], I believe they come in as substantive evidence.
THE COURT: That is my understanding ... under  I don't recall the subsection, but my understanding is that they would come in as substantive evidence.
[DEFENSE ATTORNEY:] I just want to put my strongest objections on the record, Judge.
[5] The State argued:

Even Ricky Feagle was an honest man. You saw Ricky Feagle in court testifying. He was reluctant, he was not straightforward to Ms. Peek here in court. He is a friend of the defendant, and the stepson of the codefendant [sic], but when confronted with his under oath statement to Ms. Peek, he told the truth, also, the same details about each and every crime that this man is charged with that came from only one source, Ralph Ellis.
[6] Thus, we do not believe Feagle's prior statement can be summarized or read to the jury in whole or in part as a method of impeachment on remand, because the special facts of this case make the risk too great that the jury thereby will tacitly be asked to accept as truthful the matters asserted in the statement. Carter v. United States, 614 A.2d 542, 545 (D.C. 1992). Accordingly, we can envision no reason why Feagle now could be called as a court witness on remand, and that issue effectively is moot.
[7] Obviously, there must be some evidence tending to support the finding of unusual maturity. Otherwise the mitigating factor of age must be accorded full weight as a statutory mitigating factor.
[8] In so saying, we do not now reach the issue of whether the factor of heinous, atrocious, or cruel was properly found here. A new record will be developed at retrial. Thus, the issue should not be considered until the appeal after remand, if any.
[9] Article X, section 9 provides:

Repeal or amendment of a criminal statute shall not affect prosecution or punishment for any crime previously committed.