731 So.2d 812 (1999)
Michael HUTCHINSON, Appellant,
v.
STATE of Florida, Appellee.
No. 97-2926.
District Court of Appeal of Florida, Fifth District.
April 30, 1999.
Rehearing Denied May 27, 1999.
*813 James B. Gibson, Public Defender, and M.A. Lucas, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Robin A. Compton, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, C.J.
Michael J. Hutchinson ["defendant"] appeals his convictions and sentences in four separate cases.
From approximately 5 p.m. on January 9, 1996 until 3 a.m. on January 10, 1996, defendant, a juvenile, participated in a ten-hour crime spree. He was accompanied by four other juveniles. During the crime spree, defendant took part in a home-invasion robbery, fired a shot into a trailer with a pump shotgun, burglarized a Little Debbie's Market, and engaged in a high-speed chase with police during which he fired on and struck a police officer in pursuit. Based on these acts, defendant was charged by information in four different cases with numerous offenses.
The cases were ultimately consolidated for trial over defendant's objection. Testimony concerning defendant's participation in and commission of the offenses was provided both by the victims and all four of defendant's juvenile accomplices. Their testimony showed that on January 9, 1996, all four accomplicesJoey Kauffman, Misty Taylor, Katie Simmons, and Daywin Weekswere driving around in a stolen Ford Explorer when Simmons received a page on his beeper from defendant. They went over to defendant's home and picked him up around 5:00 or 5:30 P.M. Then they went to the home of defendant's friend, Adam Mosely. Defendant went inside and came out fifteen minutes later carrying two shotguns. Defendant also had a handgun which he either brought with him or picked up at Mosely's. After retrieving the guns, they drove around for a while looking for a house to burglarize so they could get some money to buy the drug rohypnol or "roofies." They found a house without any lights on, and the three boys exited the vehicle. All three were armed. Weeks testified that only defendant and Kauffman went inside. Kauffman said that it was defendant and Weeks who went inside. Regardless, once inside, they encountered the victim, Maria Fortero, who was apparently lying in bed. Defendant grabbed her purse, and the three boys ran back to their vehicle. The victim testified that two men came into her room, one of whom put a gun to her head while the other grabbed her purse from the dresser. Upon their return to the vehicle, defendant told the girls that:
there was an old lady in there that was speaking Spanish, and that he had took her purse, because she was, I guess, laying in the bed, yelling at him, I guess, and he grabbed the purse and ran out.
Defendant looked through the victim's purse and found approximately $25. After getting the money, they drove back to Mosely's house, where defendant went inside and purchased ten roofies. Everyone ingested one or two roofies, except for Taylor. Taylor said that after ingesting the roofies, everyone became very hyper.
After taking the pills, the juveniles rode around for while. Kauffman was driving and defendant was sitting in the passenger seat. They drove by a trailer where a girl named Sara Caldwell lived. The second time they drove by, defendant fired a shotgun at the trailer. Caldwell testified that the shot went from the living room window next to where she was sitting, through the refrigerator in the kitchen, to the back room of the house.
The next stop was a Little Debbie's Market off of Goldenrod and Pershing *814 Road. It was approximately 8 P.M. Weeks testified that Kauffman and defendant got out and kicked in the top of the front door. The rest of the juveniles testified that defendant kicked in the door. Defendant then went inside, and handed out some lottery tickets and cigarettes. The victim, Ramnarine Mahabir, testified that the group stole a total of $5,778 worth of Lotto tickets and cigarettes. While they were still at the store, a police officer drove by and turned around. They heard sirens and took off. They hid behind a house for about ten minutes. While they were hiding, defendant told Kauffman that if any officers came behind the house where they were hiding, he would shoot them.
They next drove over to an apartment complex off of Semoran, where they began scratching off lottery tickets. Defendant knew someone at the apartments named Jason and went upstairs to visit him. In all, they were at the apartments maybe twenty minutes. When they pulled out of the apartments, a policeman was waiting and began to chase them. Defendant said that if a policeman got close enough, he was going to shoot at the car. They turned onto the Greenway, and a policeman was sitting there and saw them turn around in the median. He also turned around and began following the juveniles at speeds of up to 130 m.p.h. Defendant started kicking at the back window. Both he and Kauffman were saying they were not going to jail for anyone. Defendant kept yelling not to stop. The window popped open, and defendant fired at the officer once or twice. Weeks said that he thought that defendant was trying to shoot out the tires. However, the shotgun blast went through the windshield, hitting Officer Winters, and the officer turned off the road.[1] Defendant shouted something like "I got him" or "I think I got one." However, they were all saying, "Yeah, yeah, we got him." Defendant was still yelling at the driver to keep going, and not to stop. The juveniles kept going faster and faster, and exited the Greenway in Kissimmee. They then tried to get back to Narcoosee Road through Kissimmee and St. Cloud but they were chased by police cars with their lights flashing and sirens blaring. As they attempted to run through a road blocked by officers, the car hit some stop sticks set by the police and all the tires went flat. The occupants then jumped out and ran for the woods. Taylor was apprehended first. Kauffman and Weeks were apprehended after just a few minutes. Simmons and defendant were apprehended after several hours.
Defendant was found guilty of the seven counts submitted to the jury. He was sentenced to life in prison for the home invasion. He was also sentenced to life in prison for the attempted first-degree murder of a law enforcement officer with a firearm, which offense also carried a three-year mandatory minimum sentence. Defendant received fifteen years in prison for shooting at or into a building and five years for armed trespass of an occupied conveyance, burglary of a structure, and grand theft. He was also sentenced to one year in the county jail for resisting an officer without violence. All sentences were to run concurrently.
Defendant has raised three issues on appeal but only one merits discussion.[2] He complains that the court's decision to consolidate these four cases for trial was erroneous because they involved different *815 offenses, different victims, and separate and distinct factual circumstances. He further complains that the improper consolidation of these case was prejudicial in that it a finding of guilt as to one case had a cumulative effect with respect to the remaining charges.
In reviewing a trial court's decision to consolidate separate offenses, this court must apply an abuse of discretion standard. Crossley v. State, 596 So.2d 447 (Fla.1992). Florida Rule of Criminal Procedure 3.151(b) states that:
Two or more indictments or informations charging related offenses shall be consolidated for trial on a timely motion by a defendant or by the state. The procedure thereafter shall be the same as if the prosecution were under a single indictment or information. Failure to timely move for consolidation constitutes a waiver of the right to consolidation.
Rule 3.151 also provides:
For purposes of these rules, 2 or more offenses are related offenses if they are triable in the same court and are based on the same act or transaction or on 2 or more connected acts or transactions.

Fla. R.Crim. P. 3.151(a) (emphasis added).
The "connected acts or transactions" requirement of rule 3.151 means that the crimes joined for trial must be "linked" together in some significant way. Ellis v. State, 622 So.2d 991 (Fla.1993). The requisite "linkage":
can include the fact that they occurred during a "spree" interrupted by no significant period of respite, Bundy [v. State, 455 So.2d 330 (Fla.1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986)], or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time. Fotopoulos [v. State, 608 So.2d 784, 790 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993)].
Ellis, 622 So.2d at 999. The factors to consider in determining whether joinder is permissible include "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." Bundy v. State, 455 So.2d 330, 345 (Fla.1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986). The mere fact of a general temporal and geographic proximity is not sufficient in itself to justify joinder but it may help prove a link between the crimes. Ellis, 622 So.2d at 999, citing Crossley v. State, 596 So.2d 447. The term "connected acts or transactions" is not meant to refer to "similar but separate episodes," which are separated in time and are connected only by the accused's alleged guilt in both or all instances. Pittman v. State, 693 So.2d 1133 (Fla. 1st DCA 1997), review dismissed, 717 So.2d 538 (Fla.1998). Moreover, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence. State v. Williams, 453 So.2d 824, 825 (Fla.1984).
Application of these rules in crime spree cases is best seen by examination of several supreme court cases. For "crime spree" offenses to be tried together, they generally require both temporal and geographical proximity, as well as a similarity between the offenses. For example, in Bundy, the court found that the defendant was properly tried for both an attack on four women in a sorority house, which resulted in the death of two of those women, and the attack of a fifth woman roughly an hour later, which took place several blocks away. The Florida Supreme Court held that these crimes were properly joined since they were "connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated." Bundy 455 So.2d at 345.
Similarly, in Gudinas v. State, 693 So.2d 953 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 345, 139 L.Ed.2d 267 (1997), the court found that the defendant had properly been tried for two separate attacks *816 which occurred within hours on two different women. In the first attack, the defendant made three separate, unsuccessful attempts to break into the victim's car upon her exit from a local bar. Ultimately, he attempted to smash his way through the driver's side window. Although the first victim escaped, no more than three hours later, in essentially the same location, the defendant brutally raped and murdered a second victim. The court found these offenses were properly tried together, stating:
Gudinas' failure to complete his attack against Rachelle Smith may have provided a causal link to his completed attack on Michelle McGrath, thus allowing joinder under Fotopoulos. Furthermore, the State makes a persuasive argument that the attacks were separated by less than one hour. Under the State's scenario or even if approximately three hours elapsed, Gudinas' offenses constitute a crime spree as contemplated in Bundy. The attempted rape and accompanying violence of his aborted entry into Rachelle Smith's car, and the actual rape and extreme violence of his murder of Michelle McGrath demonstrate a "meaningful relationship" between the two attacks as required by Crossley.

Id. at 960. See also Rolling v. State, 695 So.2d 278 (Fla.)(within 72 hour period defendant stabbed to death five college students in their apartments, sexually battering three victims before killing them; crimes demonstrated a "temporal continuity" sufficient to constitute a "spree" under Bundy), cert. denied, ___ U.S. ___, 118 S.Ct. 448, 139 L.Ed.2d 383 (1997); Rohan v. State, 696 So.2d 901 (Fla. 4th DCA 1997) ("crime spree" cases require a showing of a similarity between types of crimes or the manner of their commission, as if the criminal conduct erupted from a "common motivational source.").
In this case, it is a close question whether it was an abuse of the court's discretion to permit all four cases to be tried together. There are four separate offensesa home invasion, shooting at or into a building, a burglary, and the attempted murder of a law enforcement officer. The offenses are dissimilar and were committed in separate geographical locations, and even in different cities. Nonetheless, the offenses were temporally connected, in that they occurred as part of a continuous "crime spree." Furthermore, defendant claims that he was under the influence of rohypnol when he committed all of the offenses (with the exception of the home invasion, which was allegedly committed to obtain the rohypnol), so that his actions during the entire sequence of events is relevant to his claim of intoxication, as well as lack of intent. Proof of the entire sequence of events is also necessary to explain how events unfolded, such as to explain where defendant got the rohypnol and why defendant and his companions were being chased by police. Finally, the same guns were used in the home invasion, the drive-by shooting, and the attempted murder. Given these links, and the continuous nature of the crime spree, we conclude that the trial court did not abuse its discretion in permitting all four cases to be consolidated for trial.
AFFIRMED.
HARRIS and PETERSON, JJ., concur.
NOTES
[1] Officer Winters does not appear to have been seriously injured, although one pellet struck him in his eyeglasses, shattering the eyeglasses, and another went through his winter jacket and deflected off his vest.
[2] Defendant also complains on appeal about the lack of a written order determining adult sanctions but this error was not brought to the attention of the lower court. We have already decided that this error cannot be raised for the first time on appeal in light of the Criminal Appeal Reform Act. Carson v. State, 707 So.2d 898 (Fla. 5th DCA 1998). Appellant also complains of the lower court's exclusion of his proffered expert but the exclusion of this witness was well within the court's discretion.