BLACK, Judge.
 

 Luc Pierre-Charles (the defendant) appeals his convictions and life sentences for two counts of first-degree murder. On July 28, 2006, Derek Pieper and Raymond Veluz were found dead, lying face down on an isolated road in Dade City, Florida. Both victims suffered multiple gunshot wounds to the backs of their heads. Two years later, the State indicted the defendant for two counts of first-degree murder. After a jury trial, the defendant was convicted as charged and sentenced to life in prison. The defendant raises five issues on appeal, only one of which requires reversal. The defendant’s arguments regarding the trial court’s admission of a witness’ prior consistent statement, the admission of certain autopsy photographs, the denial of defendant’s motion for judgment of acquittal, and the trial court’s denial of access to a witness’ grand jury testimony are without merit. However, we find error in the trial court’s admission of a hearsay statement made by the defendant’s brother, and based on this error, we reverse and remand for a new trial.
 

 I.
 
 Background Facts
 

 Witnesses testified that, at around 5:30 a.m. on July 28, 2006, they heard a series of gunshots coming from Harris Hill Road, a dirt road near their Dade City homes. The bodies of the two victims were -found on Harris Hill Road shortly thereafter. At trial, the State offered no physical evidence linking the defendant to the murders. Rather, the State built its case around the testimony of Angel Brooks and the defendant’s brother, Andre Pierre-Charles (who will hereinafter be referred to as “Andre”).
 

 Ms. Brooks made five statements related to this case. On August 14, 2006, she made her first statement to a detective. She stated that she was with Andre on the night of the murders when he received a call from an unknown caller. In her statement at the sheriffs office on August 28, 2006, Ms. Brooks did not mention a speakerphone at all. That same day, at the state attorney’s office, Ms. Brooks said she did not hear who was on the phone with Andre. Ms. Brooks first mentioned a speakerphone in her January 2009 deposition. She said she heard the defendant’s voice on the speakerphone telling the victims to get down on their hands and knees and pray. Ms. Brooks testified that she could hear the victims saying, “Please don’t. Please don’t do this.” Ms. Brooks’
 
 *303
 
 trial testimony was consistent with her deposition testimony.
 

 The State also called Andre as a witness. Prior to Andre’s testimony, defense counsel requested a proffer of Andre’s anticipated testimony outside the presence of the jury. Counsel anticipated that the State was going to discuss an August 15, 2006, videotaped conversation between Andre and his father, which took place at the police station. Detectives called Andre to the police station to question him about the murders. Both his father and mother were present in the interrogation room during the questioning. The detective and Andre’s mother left the interrogation room, and the videotape showed that while Andre and his father were alone, Andre’s father questioned him about the murders and whether he knew who committed them. His father asked, “Is it Luc?” Andre nodded his head up and down. Originally, the State argued that the videotape would serve to impeach Andre’s testimony because they expected Andre to deny nodding his head up and down in response to his father’s question. Defense counsel argued that Andre’s head nod was inadmissible hearsay because it was offered to prove the truth of the matter asserted: that the defendant killed the victims. The trial court agreed to a proffer of Andre’s testimony regarding the videotape and its contents. The court questioned Andre about the head nod:
 

 COURT: Okay. Were you nodding your head, yes, in response to his question meaning—
 

 A: No. If you look at the tape, I was nodding my head, doing hand gestures, stuff like that through really most of the whole video. That was, like, I’m tired of this; get me out of here. That wasn’t me saying, yes, my brother did it.
 

 COURT: All right. So when your father asked you, was he involved, you nodded your head yes as in, yes, I want to leave instead of, yes, he was involved. That’s what you’re telling me?
 

 A: No. I wasn’t saying that my brother did it. Okay. Throughout the whole video, they’re telling me they know I wasn’t there. So if they know I wasn’t there, how do I know what happened.
 

 [[Image here]]
 

 COURT: All right. Did you tell your father, yes, when you’re asked, did Luc and Tyree did [sic] this.
 

 A: I didn’t tell him that. I did not say that Luc and Tyree did it. How would I know if they did it or not?
 

 The prosecutor questioned Andre further:
 

 Q: Did your father ask you, “Is it Luc?”
 

 A: Yes.
 

 Q: And you nodded your head affirmatively, saying yes, right?
 

 A: Yes, but I wasn’t saying that Luc did it.
 

 Q: I’m not asking you whether or not—
 

 A: Okay. Yes. Yes.
 

 At the conclusion of the proffer, the prosecutor and the judge discussed Andre’s testimony:
 

 [PROSECUTOR]: But clearly he asked, “Is it Luc?” ... and he nodded affirmatively.
 

 COURT: Well, he said ‘Tes” now. So he’s no longer saying that that’s — he’s no longer denying that that’s what he said. He’s just saying that’s not what he meant. So it’s not impeachment. Do you agree?
 

 [PROSECUTOR]: Well, I agree, though, Judge, as long as when I ask him the questions, “Did you nod your head? It’s a yes-or-no answer. He says, ‘Tes I nodded my head in the affirmative.” You know, I’m not asking
 
 *304
 
 him for, “That’s not what I meant,” so on and so forth....
 

 Defense counsel maintained his position that the head nod was hearsay and that the State intended to use it to prove that the defendant committed the murders. Defense counsel argued that because Andre admitted to nodding his head, it came down to what he meant by that gesture, which was not proper impeachment. The court ruled that the State could ask Andre certain questions about the videotape. If Andre again admitted to nodding his head, the videotape could not be used to impeach him. If Andre denied nodding his head, then the State could impeach him with the videotape.
 

 Once the jury returned, the prosecutor questioned Andre:
 

 Q: Mr. Charles, you were asked by your father, “Who killed them, Andre? Luc?” And your mother, did she make a statement, “I don’t believe that”?
 

 A: Yes.
 

 Q: And right after that — would you agree with me that you had your head on the table, down like this (indicating), in this manner, during the portion of that video?
 

 A: Yes.
 

 Q: And right after that, did you lift your head and start shaking your head up and down affirmatively?
 

 A: Yes.
 

 [[Image here]]
 

 Q: Later on in the video, did your father ask you, “Is it Luc?”
 

 A: Yes.
 

 Q: And you were leaning — you were in a chair leaning up against the wall, right? And you nodded your head up and down?
 

 A: Yes, but I told you—
 

 Q: Is that—
 

 A: Yes.
 

 Q: That’s a yes?
 

 A: Yes. Yes. Yes. Yes.
 

 [[Image here]]
 

 ,Q: So yes to, “Is it Luc?” You said, “Yes”?
 

 [DEFENSE COUNSEL]: Objection.
 

 A: No. No. No. No.
 

 [[Image here]]
 

 [DEFENSE COUNSEL]: The issue is whether he’s shaking his head like this (demonstrating), and he said yes. He didn’t make any statements.
 

 [WITNESS]: I did not say “Yes.” You asked me did I nod my head, and I said yes. I did not tell my dad, “Yes, Luc did it.”
 

 COURT: All right.
 

 [PROSECUTOR]: Judge, I am trying to clarify with him. I asked him, “Did your dad ask you, ‘Is it Luc?’ Is that a yes?” I’m not saying that he said ‘Tes.”
 

 [[Image here]]
 

 [PROSECUTOR]: All right. So, as to that question, your dad asked you, “Is it Luc?” Right?
 

 A: Yes.
 

 Q: And you nodded your head up and down?
 

 A: Yes.
 

 [[Image here]]
 

 Q: Are you denying that you shook your head up and down?
 

 A: No.
 

 Q: So you’re denying that he asked you that question, but you’re admitting that on the second question that your father asked you, you nodded your head affirmatively?
 

 A: Yes. I nodded my head, but I also nodded my head this way, too. (Demonstrating)
 

 
 *305
 
 The State never introduced the videotape, and defense counsel chose not to cross-examine the witness.
 

 During closing arguments, the State attempted to discuss Andre’s head nod as substantive evidence. The State argued, “[TJhere was testimony as to a videotape that was running at the sheriffs office, when he was asked....” Defense counsel objected and argued that Andre’s head nod could not be used as substantive evidence because it was hearsay. The State argued that because Andre admitted to shaking his head, the nod was not impeachment evidence, and therefore, could be argued as substantive evidence. The trial court essentially agreed with the defense objection and expressed concern that hearsay testimony had already been admitted. The State then continued its closing argument without arguing Andre’s head nod any further.
 

 The jury retired to deliberate the verdict, and they submitted three questions to the court: (1) “Andre Charles, his answer to, ‘Did Luc do it?’ (2) “Andre’s whole testimony printed out”; and (3) “Andre, have his testimony read to the jury.” Defense counsel argued that the testimony should not be read back to the jury, but if it was, he moved that the court should also give the jury a curative instruction regarding hearsay evidence. The court denied that motion and read back a portion of Andre’s testimony. The jury returned a guilty verdict.
 

 II.
 
 Analysis
 

 Section 90.801(l)(c), Florida Statutes (2009), defines hearsay as “a statement, other than one made by the declar-ant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” A “statement” for purposes of hearsay includes “[njonverbal conduct of a person if it is intended by the person as an assertion.” § 90.801(l)(a)(2). “When an individual who is asked a question nods his or her head up and down to indicate an affirmative response, that conduct is intended to communicate a thought and is included within the definition of hearsay.” Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 801.2, at 772 (2009 ed.). “Hearsay includes an out-of-court statement of a witness who testifies at trial, as well as an out-of-court statement by someone who is not a witness on the stand testifying to the statement.”
 
 Carter v. State,
 
 951 So.2d 939, 944 (Fla. 4th DCA 2007) (citing Ehrhardt,
 
 Florida Evidence
 
 § 801.2 (2003 ed.)). “Merely repeating a statement in the courtroom does not convert a hearsay statement into non-hearsay.” Ehrhardt,
 
 Florida Evidence
 
 § 801.2, at 769-70 (2009 ed.). “The necessary reliability of the statement is lacking because the jury was not present to observe the demeanor of the witness when the statement was originally made and there was no opportunity for cross-examination at that time.”
 
 Id.
 

 In this case, Andre’s head nod was an out-of-court statement introduced by the State as an affirmative response to his father’s question, “Is it Luc?” Andre’s head nod constitutes hearsay in the form of a nonverbal assertion, and therefore, the trial court erred in admitting the statement. At one point, the State argued that the head nod served only as grounds for impeachment. However, Andre admitted nodding his head, thereby obviating the need for impeachment. Prior inconsistent statements offered to impeach the credibility of a witness are not hearsay because they are not offered to prove the truth of the prior statement but rather to show why the witness is not trustworthy.
 
 Ellis v. State,
 
 622 So.2d 991, 996 (Fla.1993). Moreover, Andre’s head nod was not introduced to simply attack his credibility; the
 
 *306
 
 State wanted the jury to believe in the truthfulness of Andre’s prior out-of-court statement. This purpose became apparent in closing arguments when the State referred to Andre’s videotaped discussion with his father and used the head nod as substantive evidence of defendant’s guilt. “Accordingly, the State was using the pri- or statement almost entirely for its substantive effect on the fact finder. At least to this extent, the hearsay rule must remain applicable.”
 
 Id.
 

 A trial court has discretion concerning the admissibility of evidence; however, the boundaries of this discretion are limited by the rules of evidence.
 
 Hinojosa v. State,
 
 857 So.2d 308, 309 (Fla. 2d DCA 2003) (citing
 
 Welty v. State,
 
 402 So.2d 1159, 1162-63 (Fla.1981)). Here, the trial court erred when it admitted Andre’s hearsay statement.
 
 See
 
 § 90.802 (“hearsay evidence is inadmissible”). In addition, “there is a reasonable possibility that the error affected the verdict.”
 
 Knowles v. State,
 
 848 So.2d 1055, 1059 (Fla.2003) (quoting
 
 State v. DiGuilio,
 
 491 So.2d 1129, 1139 (Fla.1986)). The burden to show that error was harmless remains with the State.
 
 DiGuilio,
 
 491 So.2d at 1139. “If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.”
 
 Id.
 

 In this case, we cannot say beyond a reasonable doubt that the error did not affect the verdict.
 
 See id.
 
 All three inquiries from the jury pertained to Andre’s testimony, specifically Andre’s response to his father’s question, “Is it Luc?” The judge’s rereading of Andre’s testimony magnified the error. “Whenever improper evidence becomes so prominent a feature of the trial, a court cannot find that the error was harmless beyond a reasonable doubt.”
 
 Ellis,
 
 622 So.2d at 998. Because the trial court erred in admitting the hearsay statement and because the State failed to show that the error was harmless, we see no alternative but to reverse for a new trial.
 

 Reversed and remanded.
 

 ALTENBERND and KELLY, JJ., Concur.