DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KERVEN CHARLES,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-658

[ July 12, 2017 ]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; David F. Crow, Judge; L.T. Case No. 13CF001257AMB.

Carey Haughwout, Public Defender, and Tara A. Finnigan, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Kimberly T. Acuña, Assistant Attorney General, West Palm Beach, for appellee.

TAYLOR, J.

Kerven Charles appeals his convictions and sentences for robbery with a weapon (Count I), false imprisonment of a victim under 13 while in possession of a weapon (Count II), burglary with assault while in possession of a weapon (Count IV), two counts of aggravated assault with a deadly weapon (Counts V and VI), and petit theft (a lesser included offense of Count VII). These charges, filed in the same information, stemmed from three criminal episodes that constituted a crime spree.

We conclude that the trial court did not abuse its discretion in denying appellant's motion to sever Counts I–III, as those offenses were part of the same crime spree as Counts IV–VII. Further, although the trial court severed Count VIII, burglary while armed, the trial court did not abuse its discretion in admitting evidence related to that offense, as it was inextricably intertwined with the charged crimes and was relevant evidence of flight and concealment. Finally, we hold that the trial court conducted a sufficient competency hearing and made an independent finding that appellant was competent to proceed. We remand, however, for entry of a written competency order.

## The Francois Incident (Counts I – III)

At around noon on February 4, 2013, Dieunata Francois returned home with her four-year-old son and parked the church van she was driving. Appellant approached Ms. Francois outside, set down a black duffle bag, and demanded money. Ms. Francois asked appellant what he was talking about. Appellant then pulled a machete out of the duffle bag and told Ms. Francois, "[I]f you don't give me your money, I will chop you up." Ms. Francois replied that she did not have any money.

While still holding the machete, appellant grabbed Ms. Francois's son by the collar and again threatened to hurt her if she did not give him money. The child began screaming and crying. Ms. Francois spoke with appellant for about 15 to 35 minutes, trying to persuade him to stop what he was doing. Ms. Francois gave appellant her wallets and showed him that she did not have any money. Appellant returned the wallets. Ms. Francois promised not to call the police if appellant let them go. Appellant released Ms. Francois's son and walked away with the black duffle bag.

## The Spector Incident (Counts IV – VII)

At 12:30 p.m. that same day, not far from Ms. Francois's house, Gregory Guzzo had an appointment with Harold and Janice Spector to provide an estimate on the cost of repairing fire damage to their home. While Mr. Guzzo was parked in front of the Spectors' home waiting for them to arrive, appellant approached Mr. Guzzo and told him that he needed some work done on property he had purchased in the neighborhood. Mr. Guzzo informed appellant that he had an appointment at that time, but could look at appellant's home later.

The Spectors then arrived and Mr. Guzzo began speaking with them in the driveway. Appellant walked up the driveway and continued to ask Mr. Guzzo about performing repairs on his house. Mr. Guzzo told appellant that he was with clients. Mr. Guzzo handed appellant his business card and asked appellant to give him a call in about an hour. Appellant walked back down the driveway and left. During these encounters outside the Spectors' home, appellant carried a black bag.

Mr. Guzzo and the Spectors went inside the home to view the damage. Shortly thereafter, appellant came to the front door and said he had a few more questions about the neighborhood. Mrs. Spector met appellant at the front door and told him, "I really can't talk to you because my house just burnt down."

Appellant then reached into his duffle bag, pulled out a machete, held it against Mrs. Spector's throat, and told her to give him money or else he would kill her. Mrs. Spector ran back inside towards her husband, screaming that appellant had a knife and was going to kill her. Mr. Spector pushed his wife into the bathroom and closed the door.

Appellant approached Mr. Guzzo and Mr. Spector, demanding money from them. Appellant held the machete close to Mr. Spector's stomach and said, "[G]ive me money or I'll f'ing kill you." Mr. Guzzo threw his wallet to appellant. Appellant picked up the wallet and ran out of the house.

Mr. and Mrs. Spector both called 911. The police arrived and set up a perimeter in the Spectors' neighborhood.

### The Jean Incident (Count VIII)

Ismith Jean, who lived in the same neighborhood as the Spectors, got a ride home from his boss at around 2 p.m. that day. They could not drive all the way to Mr. Jean's home due to the police presence in the neighborhood, so Mr. Jean's boss dropped him off a short distance from his home.

When Mr. Jean arrived at his house, he noticed that the front door was unlocked. Mr. Jean entered the house and heard some noise. He looked in his daughter's room and found appellant. Appellant had ransacked the room.

During the encounter, appellant told Mr. Jean to "shut up" and "be quiet." Mr. Jean told appellant to get out or he would call the police. Knowing that the police were already outside, Mr. Jean opened the front door and let appellant leave. Mr. Jean followed appellant out the door and pointed him out for the police, who immediately apprehended him.

Mr. Jean later found a black duffle bag on his back porch. The bag did not belong to Mr. Jean and he had never seen it before. Mr. Guzzo, Mrs. Spector, and Ms. Francois all testified that the bag recovered from Mr. Jean's home looked like the same bag that appellant was carrying during their encounters with him.

### Motions to Sever and to Exclude the Contents of the Duffle Bag

While appellant was representing himself, he filed a pro se motion to sever Count VIII—i.e., the charge that appellant committed a burglary of the Jean residence. The trial court granted the motion to sever Count VIII,

but ruled that evidence related to the Jean burglary would be admissible as evidence of flight, hiding from police, and consciousness of guilt.

Before appellant's second trial (the first ended in a mistrial), the defense moved to sever Counts I, II, and III—i.e., the charges related to the Francois incident. Defense counsel conceded that the charges were properly joined, but argued that the inquiry "doesn't end there" and that appellant was entitled to have separate trials to prevent prejudice. The trial court denied the motion to sever Counts I, II, and III, ruling that the charges were part of a crime spree and were connected by temporal proximity, location, and the nature and manner of criminal activity.

The defense later moved to exclude the contents of the black duffle bag, which included a knife, rope, duct tape, and condoms. The trial court ruled that the contents of the bag were admissible, except for the condoms, because they were relevant to the burglary charge. The court agreed to give a limiting instruction that the contents were relevant solely to that charge.

On appeal, appellant challenges two rulings of the trial court: (1) the denial of appellant's motion to sever Counts I-III, which related to the Francois incident; and (2) the admission of evidence regarding Count VIII, which had been severed and which related to the Jean incident. Appellant maintains that none of the criminal episodes were related, but rather were "random acts by a likely mentally ill person." He further argues that severance of Counts I-III was necessary for a fair determination of his guilt or innocence, and that the admission of evidence of the Jean incident was more prejudicial than probative.

The State responds that the trial court properly denied appellant's motion to sever Counts I–III, as the charges were part of a crime spree and were connected by temporal proximity, location, and the type and manner of criminal activity. The State further argues that the trial court properly admitted evidence relating to the Jean incident, such as appellant hiding in Mr. Jean's home and telling him to be quiet, as such evidence was evidence of flight and concealment and was relevant to show consciousness of guilt.

### Standard of Review

"The decision to grant or deny a motion for severance rests within the sound discretion of the trial court." *Smithers v. State*, 826 So. 2d 916, 923 (Fla. 2002). Likewise, a trial court's rulings on the admissibility of evidence will not be disturbed absent an abuse of discretion. *Thomas v. State*, 748

4

So. 2d 970, 982 (Fla. 1999).

## Denial of Motion to Sever Counts I-III (the Francois Incident)

For offenses to be properly charged in a single indictment or information, they must meet the requirement for joinder set forth in Florida Rule of Criminal Procedure 3.150. *Crossley v. State*, 596 So. 2d 447, 449 (Fla. 1992). "Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses . . . are based on the same act or transaction or on 2 or more connected acts or transactions." Fla. R. Crim. P. 3.150(a).

The "connected acts or transactions" requirement in rule 3.150(a) calls for the charges joined for trial to be considered in an episodic sense. *Garcia v. State*, 568 So. 2d 896, 899 (Fla. 1990). Furthermore, "for joinder to be appropriate the crimes in question must be linked in some significant way." *Ellis v. State*, 622 So. 2d 991, 1000 (Fla. 1993). "This can include the fact that they occurred during a 'spree' interrupted by no significant period of respite, . . . or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time." *Id.*

"Courts may consider the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." *Garcia*, 568 So. 2d at 899 (citation and internal quotation marks omitted). Nevertheless, "interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence." *Id.* Even where joinder is otherwise proper, a defendant is entitled to have separate trials upon a showing that severance is "necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." *Fotopoulos v. State*, 608 So. 2d 784, 790 (Fla. 1992). "The danger in improper consolidation lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other." *Crossley*, 596 So. 2d at 450. Accordingly, a trial judge "must be careful that there is a meaningful relationship between the charges of two separate crimes before permitting them to be tried together." *Id.*

The Florida Supreme Court's opinion in *Bundy v. State*, 455 So. 2d 330 (Fla. 1984), *abrogated on other grounds by Fenelon v. State*, 594 So. 2d 292 (Fla. 1992), provides a quintessential example of a "crime spree." In that case, serial killer Ted Bundy went on a rampage in housing facilities near Florida State University in Tallahassee. *Id.* at 334. Bundy attacked four women, killing two, in a sorority house, and then, roughly an hour later,

5

went to an apartment a few blocks away and attacked a fifth woman. *Id.* All of the women were bludgeoned with a blunt weapon. *Id.* The supreme court held that the crimes were connected and constituted a single uninterrupted crime spree for purposes of consolidation:

> In determining whether two acts or transactions are connected for purposes of consolidation, this Court has considered the temporal and geographical association, the nature of the crimes, and the manner in which they were committed. . . . Here the crimes occurred within a few blocks of each other and within the space of a couple of hours. The crimes were similar in that they involved a person entering the residences of female students in an off-campus neighborhood and beating young white women with a club as they slept. Hence the criminal acts are connected by the close proximity in time and location, by their nature, and by the manner in which they were perpetrated.

*Id.* at 345 (citations omitted).

Offenses that occur during a "crime spree" may be tried together when they share a high degree of similarity or a causal link. *See Rolling v. State*, 695 So. 2d 278, 295–96 (Fla. 1997) (holding that murders of five college students within a 72-hour period by serial killer Danny Rolling were properly joined as a "spree" for penalty phase purposes); *Fotopoulos*, 608 So. 2d at 789–90 (finding that murder and attempted murder charges were connected in an episodic sense where defendant used a videotape of an accomplice murdering one victim as leverage to force the accomplice to attempt a second murder); *Rohan v. State*, 696 So. 2d 901, 903 (Fla. 4th DCA 1997) (concluding that two burglaries of separate residences of two women were committed during a "spree" where they were committed within a period of less than one hour, the crimes were not interrupted by a significant period of respite, the first burglary provided a causal link to the defendant's more aggressive entry at the second residence, and a strong similarity existed between the crimes), *abrogated on other grounds by State v. Smith*, 840 So. 2d 987 (Fla. 2003).

Here, the trial court did not abuse its discretion in denying appellant's motion to sever Counts I–III. The crimes committed in the Francois incident (Counts I–III) and the Spector incident (Counts III–VII) constitute a crime spree under *Bundy* and its progeny. As the trial court recognized, the crimes were extremely close in geographic proximity, temporal proximity, and similar in the manner in which they were committed. The two incidents occurred within a few blocks of each other. They occurred

6

within about a thirty-minute span, with no significant period of respite, as the Spector incident occurred almost immediately after the Francois incident ended. Finally, the two incidents were extremely similar; in both incidents, appellant pulled a machete out of a black duffle bag, threatened the victims with the machete, and demanded money.

Moreover, there was no showing that severance was necessary to promote a fair determination of appellant's guilt or innocence. Even if there had been separate trials, evidence of each incident would have been admissible at the trial of the other for the following purposes: (1) as evidence of the perpetrator's identity; (2) to show a common scheme and motive; and (3) to show the entire context of crimes that were inextricably intertwined.

**Admission of Evidence Related to Count VIII (the Jean Incident)**

"When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." *Straight v. State*, 397 So. 2d 903, 908 (Fla. 1981). "Where there is a sufficient nexus between flight and the crime with which a defendant is charged, evidence of flight is relevant to infer consciousness of guilt." *Rutherford v. State*, 902 So. 2d 211, 215 (Fla. 4th DCA 2005).

Additionally, one category of admissible evidence of uncharged crimes is known as dissimilar fact evidence. *McGirth v. State*, 48 So. 3d 777, 787 (Fla. 2010). Dissimilar fact evidence is not *Williams*[1] rule evidence, but instead is "evidence of uncharged crimes which are inseparable from the crime charged" or "evidence which is inextricably intertwined with the crime charged." *Griffin v. State*, 639 So. 2d 966, 968 (Fla. 1994). Such evidence is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue" and it "is necessary to admit the evidence to adequately describe the deed." *Id.* (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)).

"Dissimilar fact evidence of uncharged misconduct—which is governed by section 90.402's general rule of relevancy—is admissible to establish the relevant context in which the charged criminal acts occurred." *Gosciminski v. State*, 132 So. 3d 678, 694 (Fla. 2013) (citation, internal quotation marks, and alterations omitted). Notice of intent to offer

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

*Williams* rule evidence "is not required if the State seeks to introduce evidence of collateral acts which are inextricably intertwined with the crime charged under the general rule of relevance." *Tripoli v. State*, 50 So. 3d 776, 779–80 (Fla. 4th DCA 2010).

"Evidence is inextricably intertwined if the evidence is necessary to (1) adequately describe the deed; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose, or (4) adequately describe the events leading up to the charged crime(s)." *McGee v. State*, 19 So. 3d 1074, 1078 (Fla. 4th DCA 2009) (citation and internal quotation marks omitted). For example, inextricably intertwined evidence concerning the circumstances surrounding the charged crime may be admitted as evidence of the perpetrator's identity. *See Dorsett v. State*, 944 So. 2d 1207, 1215 (Fla. 3d DCA 2006) (collateral crimes evidence of prior drug sales that occurred during the same surveillance of the parking lot was inextricably intertwined and relevant to the only material issue in dispute—whether the officer was mistaken as to the identity of the seller).

Here, the trial court did not abuse its discretion in admitting evidence concerning the Jean incident, including the evidence relating to the black duffle bag.

First, the evidence concerning the Jean incident—i.e., that appellant was hiding in Mr. Jean's home at a time when the police had established a perimeter in the neighborhood—was relevant evidence of flight and concealment. In light of the nexus between the charged crime and appellant's entry into the Jean home, the evidence was relevant to show consciousness of guilt.

Second, the Jean incident was inextricably intertwined with the crimes arising from the Francois and Spector incidents. Evidence concerning the Jean incident was necessary to provide an intelligent account of the charged crimes. The evidence of the Jean incident was not admitted to prove appellant's bad character. Rather, this evidence was admitted to show a chronological chain of events that culminated in appellant's capture and the discovery of a black duffle bag at the Jean residence—a duffle bag that looked the same as the one appellant was carrying during the charged crimes. The contents of the bag were relevant to the perpetrator's intent, and the discovery of the bag at the Jean residence was relevant to the perpetrator's identity.

We therefore conclude that the trial court did not abuse its discretion in denying appellant's motion to sever Counts I–III, as those offenses were

part of the same crime spree as Counts IV–VII. Further, although the trial court severed Count VIII, the trial court did not abuse its discretion in admitting evidence related to that offense, as it was inextricably intertwined with the charged crimes and was relevant evidence of flight and concealment.

## Determination of Appellant's Competency

Appellant also argues that the trial court's third and last determination of appellant's competency failed to comport with the rules of criminal procedure.[2] Additional facts are relevant to this issue.

Before the first trial in this matter, the trial court ordered multiple examinations of appellant's competency and twice found appellant to be competent "[b]ased on the proceedings before the Court and the stipulation between the parties."

At the outset of the first trial, appellant elected to represent himself with the Public Defender's Office acting as standby counsel. Based on the *Faretta*[3] colloquy and the motions appellant had filed in the case, the trial court found appellant competent to represent himself.

Appellant engaged in disruptive behavior during the first trial. The trial court appointed the Public Defender's Office to represent appellant, finding that while appellant was competent to proceed as a defendant, he was no longer competent to represent himself as an attorney. The trial court granted defense counsel's request for a competency evaluation of appellant and granted counsel's motion for a mistrial.

During the discussion on appellant's competency, defense counsel believed appellant's evaluation should occur in a "rush." The trial court wanted an expert to evaluate appellant that day and, if the expert reported back that appellant was not competent, then the court would refer appellant to mental health court. The trial court ordered an evaluation by a "single doctor." The trial court directed that the experts who had previously evaluated appellant be contacted first. If they were not available, additional calls would be made to find someone who could perform the evaluation that day.

The trial court later noted that calls to the experts who had previously

[2] Judge Kastrenakes, a predecessor judge, determined appellant's competency.

[3] *Faretta v. California*, 422 U.S. 806 (1975).

9

examined appellant were unsuccessful, but that Dr. Brannon was available to examine appellant that night. The trial court concluded the hearing by indicating that if Dr. Brannon found that appellant was not competent, then no other dates would be set and the appellant would be referred to mental health court. There was no objection to this procedure by either party.

At a subsequent hearing on July 31, 2014, the trial court recounted the procedural history of the case and made a finding on the record that appellant was competent to proceed:

> THE COURT: . . . [T]he Court made a determination . . . based on comments made by Mr. Charles in the course of that hearing, that he no longer was competent to represent himself.
>
> I then immediately put [defense counsel] on the case, and she made two requests of the Court as [appellant's] attorney. One was to have him examined by a psychologist or psychiatrist concerning his present competency to proceed. And then the second request was to suspend the motion to suppress and to continue the trial. All three requests of [defense counsel] were granted by the Court. With respect to the competency, the Court tried -- the reason I had called around to try to find someone because it was my intent to see if we could go forward as soon as possible, and I wanted to get somebody who could get an examination done as quickly as possible, and I don't -- I know I have included here -- it's a doctor out of Fort Lauderdale.
>
> [DEFENSE COUNSEL]: It's Dr. Brannon.
>
> THE COURT: Dr. Brannon. Dr. Brannon agreed to do it quickly, but it really wasn't so quick. It took a couple of weeks to get his report back. I did get his report back. I did get his report back. It indicated that his finding was that the defendant was competent and is competent. And so, his adjudication of competency continues. I do find, unless there is a request for anything else with respect to proceeding forward that he, in fact, remains competent. He had never been adjudged incompetent prior to the hearing.

The parties did not request to address the competency issue further, and instead proceeded with testimony relevant to a motion to suppress.

The trial court did not enter a written order finding appellant competent.

On appeal, appellant argues that the trial court reversibly erred in failing to hold a hearing concerning appellant's third competency evaluation, appointing only one examiner to evaluate appellant, failing to include the examiner's report in the court file, and failing to issue a written order of competency.

In response, the State argues "that there was a hearing, that the trial court and counsel had received Dr. Brannon's evaluation, and that the trial court made an independent finding of competency at the hearing."

The issue of whether the trial court erred in failing to hold a competency hearing is reviewed de novo. *Presley v. State,* 199 So. 3d 1014, 1017 (Fla. 4th DCA 2016).

When a trial court "has reasonable grounds to believe that a criminal defendant is not competent to proceed, it has no choice but to conduct a competency hearing." *Monte v. State*, 51 So. 3d 1196, 1202 (Fla. 4th DCA 2011). The trial court "may order the defendant to be examined by no more than 3 experts, as needed, prior to the date of the hearing." Fla. R. Crim. P. 3.210(b).

Once the trial court appoints experts to examine the defendant's competency, the trial court may not proceed against the defendant without holding a competency hearing and ruling on the defendant's competency. *See Silver v. State*, 193 So. 3d 991, 992 (Fla. 4th DCA 2016) ("We vacate the challenged convictions and sentences because the trial court appointed experts to examine Silver to determine whether he was competent to proceed, but never held a competency hearing or ruled on his competence before he was tried."); *Blaxton v. State*, 188 So. 3d 48, 48–49 (Fla. 1st DCA 2016) (reversing for further proceedings where, although it was undisputed that a competency evaluation was completed, the report had not been filed in the lower tribunal and "the record does not reflect that the requirements of judicial review and adjudication of competency were met below"); *see also Presley*, 199 So. 3d at 1018 (where the trial court merely acknowledged that it had been advised by the Department of Children and Families that the defendant was restored to competency, the trial court did not hold the necessary competency hearing and did not make an independent determination of the defendant's competency before proceeding against him).

A trial court has the duty to make an independent determination of a criminal defendant's competency to proceed. *Dougherty v. State*, 149 So. 3d 672, 673 (Fla. 2014). A defendant cannot stipulate to the ultimate issue of competency, because "[a]ccepting a stipulation improperly absolves the trial court from making an independent determination regarding a defendant's competency to stand trial." *Id.* at 678. "Although the trial court, when the parties agree, may decide the issue of competency on the basis of written reports alone, it cannot dispense with its duty to make an independent determination about a defendant's competency, and must enter a written order if the defendant is found competent to proceed." *Id.* at 679.

A defendant cannot, either expressly or implicitly, waive the right to a competency hearing. *Deferrell v. State*, 199 So. 3d 1056, 1061 (Fla. 4th DCA 2016). During the competency hearing, "[t]he experts preparing the reports may be called by either party or the court, and additional evidence may be introduced by either party." Fla. R. Crim. P. 3.212(a). Moreover, "[t]he experts appointed by the court shall be deemed court witnesses whether called by the court or either party and may be examined as such by either party." *Id.*

We have explained that "[a] status hearing may constitute a sufficient competency hearing if the court reviews a written competency evaluation at the parties' direction and makes an independent finding that the defendant is competent to proceed." *Presley*, 199 So. 3d at 1018. For example, a trial court conducted a sufficient competency hearing where, although the court did not call experts, both parties directed the court to key language in the competency report, the court noted that it had reviewed the evaluation, and the court specifically stated that the defendant was competent to proceed. *Merriell v. State*, 169 So. 3d 1287, 1288 (Fla. 1st DCA 2015). Likewise, a trial court conducted a sufficient competency hearing where the court made an oral determination that the defendant was competent after considering the experts' reports, the statements of defense counsel, and the defendant's demeanor. *Holland v. State*, 185 So. 3d 636, 637 (Fla. 2d DCA 2016).

By contrast, a trial court did not properly decide the issue of competency where the parties stipulated to the defendant's restored competency and the court conducted its own review of the doctor's report, but "neither party stipulated to the contents and admission of the doctor's report," and there was never "any form of agreement between the parties and the judge to decide the issue of competency on the basis of the written report alone." *S.B. v. State*, 134 So. 3d 528, 530 (Fla. 4th DCA 2014).

Here, the record reflects that the trial court addressed appellant's competency at the July 31, 2014 hearing, that the trial court had received and reviewed Dr. Brannon's evaluation finding appellant to be competent, and that the trial court made an independent determination that appellant remained competent to proceed. Notably, appellant was never determined to be incompetent at any point during the case, and the trial court had ample opportunity to observe appellant when he was representing himself. Moreover, at the conclusion of the hearing, the trial court specifically stated: "I do find, unless there is a request for anything else with respect to proceeding forward that he, in fact, remains competent."

Although there was not an express stipulation to decide the issue of competency solely on the basis of Dr. Brannon's report, it appears from the record that the parties and the judge agreed to decide the issue of competency on the basis of the written report alone. Before concluding the competency hearing, the trial court specifically asked if there was "a request for anything else with respect to proceeding forward . . . ." The parties' silence in the face of this clear opportunity to request either live testimony or additional competency evaluations demonstrates that the parties agreed to the trial court's procedure of deciding the issue of competency on the basis of Dr. Brannon's written report alone.

We also note that, contrary to appellant's suggestion, the trial court was not required to appoint a minimum of two experts. *See Tita v. State*, 42 So. 3d 838, 840 (Fla. 4th DCA 2010) (explaining that the relevant statute and rule of criminal procedure were amended to remove the requirement for a court to appoint no fewer than two experts).

Finally, the fact that Dr. Brannon's report was not filed in the record does not mean that the issue of competency was improperly determined. Although in *Silver* we vacated the defendant's convictions where "the record contain[ed] no doctor's reports, no hearing on Silver's competence, and no order on the matter," 193 So. 3d at 993, in this case the absence of a competency report in the court file is not dispositive. In *Silver*, the absence of a competency report in the record was merely one factor supporting the conclusion that the trial court did not adjudicate the issue of the defendant's competency.

Here, the record shows that the trial court held a hearing addressing appellant's competency, reviewed the expert's competency report, and made an independent determination that appellant was competent to proceed.

**Conclusion**

13

Based on the foregoing, we affirm appellant's convictions.  But because the trial court did not enter a written order of competency, we remand the case to the trial court for entry of a nunc pro tunc order finding appellant competent to stand trial.  *See Holland*, 185 So. 3d at 637.

*Affirmed and Remanded for entry of a nunc pro tunc competency order.*

CIKLIN and MAY, JJ., concur.

*          *          *

***Not final until disposition of timely filed motion for rehearing.***