DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CLARCK PAUL,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2023-2680

[March 26, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin Fein, Judge; L.T. Case No. 16-009425-CF10A.

Antony P. Ryan, Regional Counsel, and Paul O'Neil, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fourth District, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee, and Sorraya M. Solages-Jones, Senior Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Clarck Paul appeals his convictions for first-degree murder, second-degree murder, attempted second-degree murder, and aggravated fleeing to elude. We affirm the convictions and write primarily to address three issues—severance, jury selection, and closing argument. On the jury selection issue, we certify a question to the Florida Supreme Court.

### *Background*

This case arises out of a crime spree involving two shootings and a high-speed, nighttime police chase.

On the night of August 5, 2016, Paul (a.k.a. "Zoe") was driving a silver Hyundai rental car. One of the car's passengers, Vanessa Jean, observed both shootings and testified for the State at trial. Also in the car were a man whom Vanessa did not know, and Vanessa's friend, Nesha, who was in a relationship with Paul.

### The First Shooting

The first shooting occurred in Deerfield Beach at about 10:28 p.m.

In the moments leading up to the shooting, Carlos Senluis picked up his friend, Gabriel Severino, at Severino's house for a night out. As they were driving down the street, they turned around and headed back to Severino's house so Severino could get cash from his car. On the way, Paul's Hyundai approached from the opposite direction. Both cars stopped. Senluis's vehicle flashed its lights at Paul's car. Paul got upset, but then backed up his car, allowing Senluis to proceed.

Senluis parked at Severino's house. Paul then pulled his car next to Senluis's vehicle, parking so that the passenger sides of the two cars directly faced each other.

Paul aggressively spoke to Senluis and Severino. Paul then fired several shots into Senluis's car and sped off. A bullet struck Senluis in the head, and he later died. Severino was not injured. Prior to the shooting, the occupants of Senluis's car had not threatened or yelled at Paul.

Severino testified that the driver of the other vehicle was a black male. Severino was unable to detect an accent when the driver spoke. However, a law enforcement officer testified that Paul had a Haitian accent.

A neighbor heard three gunshots and then saw a silver car "flying by" a few seconds later. Vanessa testified that Paul was driving "really fast." Paul told the other occupants in the car: "If you want to snitch, you could snitch, I'll shoot you guys too, I don't care." Defense counsel elicited testimony that an investigating detective referred to the shooting as a "road rage" incident in his report because "apparently the headlights annoyed" Paul.

### The Second Shooting

The second shooting occurred about 13 miles away in Lauderdale Lakes at around 11:04 p.m. Vanessa testified that Paul drove to the location of the second shooting. The victim of the second shooting, Lamont Smalls, was sitting on a wall outside an apartment complex when Paul drove up. Paul got out of the car with his gun and approached the group of people outside. According to Vanessa, Paul started bragging about shooting a guy in Deerfield. Paul then accused Smalls of "snitching" and shot him

2

twice, killing him. Smalls had not threatened Paul in any way prior to the shooting.

About two weeks before Smalls was killed, law enforcement had interviewed him as a witness to another shooting.

Two witnesses in the crowd knew Paul from the neighborhood as "Zoe" and identified him as the person who shot Smalls. Vanessa similarly described the shooting as follows: "[Paul] had stated that if you snitch I will shoot you. . . . And then he walked over to the victim and he shot him."

After shooting Smalls, Paul fled in his car. A witness told an officer on scene that the shooter drove off in a gray Hyundai.

### *The Police Chase*

Around 3:00 a.m., a detective investigating the Deerfield Beach shooting spotted a silver car matching the description of the suspect's vehicle. Officers attempted to stop the car, but Paul fled at high speed, triggering a police chase that culminated in Paul's Hyundai crashing into a tree in Pompano Beach. Paul, Nesha, and Vanessa all got out of the car and ran away. According to Vanessa, the man she did not know had gotten out of the Hyundai before the crash.

Law enforcement, including aviation and K-9 units, began a manhunt. Paul was found in a truck camper and taken into custody. A Glock 9mm was found several houses away in the grass.

### *DNA and Ballistics Evidence*

A DNA analyst testified that swabs taken from the Hyundai's steering wheel and cigar tip showed that Paul's DNA was a contributor or major contributor, with astronomical odds against the samples originating from a random, unrelated individual. She further testified that swabs from the Glock showed a mixture of three contributors. Paul's DNA was the major contributor of the profile on the Glock's grips, trigger and sights, with less than a 1 in 400 billion chance of a match from a random, unrelated person. For the minor contributors, the DNA analyst "could not make interpretations." A firearms examiner opined, within a reasonable degree of scientific certainty, that shell casings recovered from both the Deerfield Beach and Lauderdale Lakes crime scenes were fired from the recovered Glock.

### *The Charges, the Trial, the Verdict, and Sentencing*

Paul was indicted on two counts of first-degree murder for the deaths of Senluis and Smalls, one count of attempted first-degree murder for shooting at Severino, and one count of aggravated fleeing to elude. The State sought the death penalty.

The case proceeded to trial, which revealed the facts set forth above. The jury found Paul guilty as charged of the first-degree murder of Smalls and aggravated fleeing to elude. For the charges involving Senluis and Severino, the jury found Paul guilty of the lesser-included offenses of second-degree murder and attempted second-degree murder. The jury rejected the death penalty, and Paul was sentenced to life in prison for the two murders, concurrent with prison terms for the other charges.

### *The Circuit Court Did Not Abuse its Discretion in Refusing to Sever the Smalls Murder Charge from the Other Charges*

In 2018, Paul moved to sever Count I of the indictment—charging Paul with the first-degree murder of Smalls—from the remaining counts. The 2018 predecessor judge denied the motion.

In 2022, Paul moved for reconsideration of his motion to sever. During a two-day hearing, Judge Fein considered this motion, along with other motions, and heard testimony from police officers.

Following the hearing, Judge Fein denied Paul's renewed motion to sever, reasoning that both incidents were part of a single crime spree. The court noted that "both murders occurred within 36 minutes of each other, the same firearm was used to commit both murders, the Defendant drove the same vehicle to and from the location of each murder[,] and Vanessa Jean was present in the Defendant's vehicle and witnessed both murders." Judge Fein adopted the findings, conclusions, and reasoning of the predecessor judge's order.

The standard of review for an order on a motion for severance is abuse of discretion. *Dupree v. State*, 705 So. 2d 90, 95 (Fla. 4th DCA 1998).

*Legal Framework for Severance of Charges*

"Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses . . . are based on the same act or transaction or on 2 or more connected acts or transactions." Fla. R. Crim. P. 3.150(a).

4

Under rule 3.150(a), joinder is appropriate when separate crimes are "linked in some significant way." *Ellis v. State*, 622 So. 2d 991, 1000 (Fla. 1993). "The 'connected acts or transactions' requirement in rule 3.150(a) calls for the charges joined for trial to be considered in an episodic sense." *Charles v. State*, 223 So. 3d 318, 324 (Fla. 4th DCA 2017). "Courts may consider the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." *Garcia v. State*, 568 So. 2d 896, 899 (Fla. 1990) (citation and internal quotation marks omitted).

For example, offenses that occur during a crime spree are "connected" within the meaning of rule 3.150(a) "when they share a high degree of similarity or a causal link." *Charles*, 223 So. 3d at 325. "But the mere fact of a general temporal and geographic proximity is not sufficient in itself to justify joinder except to the extent that it helps prove a proper and significant link between the crimes." *Ellis*, 622 So. 2d at 1000.

A significant link between two offenses can be based upon "the fact that they occurred during a 'spree' interrupted by no significant period of respite, . . . or the fact that one crime is causally related to the other, even though there may have been a significant lapse of time." *Id.* For offenses to be tried together as a "crime spree," they must demonstrate not only "temporal and geographic proximity," but also a "similarity between the offenses." *Stephens v. State*, 863 So. 2d 434, 436 (Fla. 4th DCA 2003). Alternatively, joinder is appropriate where there is a "causal link" between crimes, meaning that "one crime is used to induce the other" or "evidence of one crime is necessary to explain the other." *Rodriguez v. State*, 909 So. 2d 547, 550 (Fla. 4th DCA 2005).

Still, even when related offenses are properly joined, the trial court should grant a severance of charges "on a showing that the severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense." Fla. R. Crim. P. 3.152(a)(2); *see also Fotopoulos v. State*, 608 So. 2d 784, 790 (Fla. 1992). "The danger in improper consolidation lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other." *Crossley v. State*, 596 So. 2d 447, 450 (Fla. 1992). Therefore, "the court must be careful that there is a meaningful relationship between the charges of two separate crimes before permitting them to be tried together." *Id.*

An example of a causally connected offenses occurred in *Livingston v. State*, 565 So. 2d 1288, 1290 (Fla. 1988), where the Florida Supreme Court

5

held that joinder was proper where "the pistol stolen in the burglary became the instrument for effecting the armed robbery and murder."

An example of a "crime spree" is found in *Charles*, where the defendant used a machete to commit robberies and a burglary at two different homes in the same neighborhood within 30 minutes. 223 So. 3d at 322. We held that the trial court did not abuse its discretion in denying the motion to sever because "the crimes were extremely close in geographic proximity, temporal proximity, and similar in the manner in which they were committed." *Id.* at 325. We explained:

> The two incidents occurred within a few blocks of each other. They occurred within about a thirty-minute span, with no significant period of respite, as the [second] incident occurred almost immediately after the [first] incident ended. Finally, the two incidents were extremely similar; in both incidents, appellant pulled a machete out of a black duffle bag, threatened the victims with the machete, and demanded money.

*Id.* We also pointed out that "[e]ven if there had been separate trials, evidence of each incident would have been admissible at the trial of the other for the following purposes: (1) as evidence of the perpetrator's identity; (2) to show a common scheme and motive; and (3) to show the entire context of crimes that were inextricably intertwined." *Id.*

By contrast, in *Stephens*, we held that the trial court's effective denial of a motion for severance was an abuse of discretion where the defendant stole a vehicle in one incident and, later that day, took the vehicle to a gas station where he assaulted a 74-year-old woman and stole her purse. 863 So. 2d at 435–37. We explained that "[w]hile both instances involve theft, there is not enough similarity in the nature and manner to link the two crimes together as a crime spree." *Id.* at 437. We also rejected the notion that the offenses were causally connected, reasoning that "the stolen [vehicle] did not cause the assault and robbery of [the victim]" and that no evidence existed that the stolen vehicle had "aided [the defendant] in perpetrating the crimes committed against [the victim]." *Id.*; *see also Hart v. State*, 70 So. 3d 615, 618–20 (Fla. 1st DCA 2011) (holding that trial court abused its discretion in allowing joinder of two episodes—a sexual battery and a carjacking—involving separate victims, even though the offenses occurred hours apart in the same neighborhood, because the episodes were "freestanding and distinct").

6

*Severance Law Applied to this Case*

Here, the trial court did not abuse its discretion in denying the motion for severance because the four offenses were all linked in significant ways. The shootings were committed during a crime spree, in close geographic and temporal proximity, and in a similar manner. The high-speed chase arose out of the investigation of one of the murders. The episodes were causally connected, and severance was not necessary to achieve a fair determination of Paul's guilt or innocence of each offense.

The two murders occurred within a span of about 36 minutes and happened about 13 miles apart. While the motives for the two murders may have been different (road rage vs. snitching), the murders were committed in a similar manner, with Paul verbally confronting the victim in an aggressive manner and then shooting the victim without provocation.

The murder offenses in this case share greater similarity than the offenses at issue in either *Hart* (sexual battery and carjacking) or *Stephens* (grand theft auto and purse snatching). The offenses here involved the same vehicle and firearm. More importantly, Vanessa Jean, a passenger in the car, witnessed both shootings and was present for the entirety of Paul's crime spree.

The offenses were also connected because events at the second shooting are relevant to explain that shooting and identify the perpetrator of the first shooting. Paul made a significant admission at the second murder scene. Immediately before killing Smalls, he bragged about killing a man in Deerfield. Also, between the shootings, Paul threatened to shoot the occupants of the Hyundai if they snitched about the first shooting. A reasonable inference from the evidence is that part of Paul's motive for killing Smalls was to send a message to the witnesses of the Senluis murder about what could happen if they snitched.

Finally, severance was not necessary to achieve a fair determination of Paul's guilt or innocence of each offense. Even if there had been separate trials, evidence of each incident would have been admissible at the trial of the other for the following purposes: (1) as evidence of the perpetrator's identity; and (2) to show the entire context of crimes that were inextricably intertwined. While the offenses were not the product of an identical motive, the episodes were nonetheless inextricably intertwined as part of the same crime spree. Evidence of the events of the entire night were necessary to present a complete and coherent narrative of what transpired, particularly from Vanessa's perspective.

Nothing in the record suggests that the jury was unable to fairly evaluate the evidence as to each offense. The jury convicted Paul of lesser-included offenses on two of the four charges.

### *The Method of Jury Selection Did Not Violate the Defendant's Rights*

*The Method of Jury Selection*

During jury selection, the trial court used a random number generator to seat the first twelve prospective jurors as the initial panel. When a party exercised a peremptory strike against a prospective juror on the panel, that juror was replaced by the next person in the randomly-generated sequence. The parties did not have a copy of the random list, so they did not know who would be called to replace a stricken juror.

Defense counsel repeatedly objected to this procedure, describing the process as "blindfolded" and arguing that it prevented him from making intelligent decisions regarding peremptory strikes. Over Paul's objections, the trial court continued with this procedure.

Paul exercised all his peremptory challenges and identified four objectionable jurors that he would have stricken with additional peremptories. Additionally, before the jury was sworn, Paul renewed his "objection to the court's procedure in not giving us the type of opportunity to exercise peremptory challenges intelligently by hiding from us the identity of the people that come up once the strike is made."

In this appeal, Paul argues that the trial court erroneously used a "nontraditional procedure for peremptory strikes" during jury selection, which "hindered the parties' ability to strategically exercise peremptory challenges" and left the parties "unable to consider the panel as a whole when exercising their challenges." The State responds that the trial court did not abuse its discretion in utilizing a random sequence method as part of its jury selection procedure, as Paul was not prevented from a meaningful and intelligent use of all of his peremptory challenges.

A trial court's jury selection procedure is reviewed for an abuse of discretion. *See Rock v. State,* 638 So. 2d 933, 934 (Fla. 1994).

*Legal Framework for Jury Selection*

Article I, section 16 of the Florida Constitution provides criminal defendants with "the right to a speedy and public trial by an impartial

8

jury." When prospective jurors are called to duty, they must be selected at random. *State v. Silva*, 259 So. 2d 153, 163 (Fla. 1972). The constitution does not mandate a procedure for picking a jury; the focus of section 16 is on the impartiality of the jury.

A defendant's right to an impartial jury "does not entitle that defendant to be tried by any particular jurors or by a jury of a particular composition." *West v. State*, 584 So. 2d 1044, 1045 (Fla. 1st DCA 1991). "The right is not one of selection; it is to reject jurors who are biased, prejudiced, or otherwise incompetent." 33 Fla. Jur. 2d Juries § 78.

"[T]he peremptory challenge contributes significantly to the selection of a fair jury[.]" *State v. Alen*, 616 So. 2d 452, 453 (Fla. 1993). "While there is no freestanding constitutional right to exercise peremptory challenges at either the state or federal level, Florida courts have long recognized that such challenges are nonetheless one of the most important of the rights secured to the accused." *Jones v. State*, 229 So. 3d 834 (Fla. 4th DCA 2017) (Klingensmith, J., concurring) (internal quotation marks omitted).

Florida Rule of Criminal Procedure 3.350 provides for a specific number of peremptory challenges depending on the severity of the charge. *See* Fla. R. Crim. P. 3.350. "The central function of peremptory challenges is to enable each side to exclude those jurors it believes will be most partial toward the other side." *Hayes v. State*, 94 So. 3d 452, 459 (Fla. 2012), *disapproved of on other grounds by State v. Johnson*, 295 So. 3d 710 (Fla. 2020) (cleaned up). In essence, "jury selection operates as a predicate for the exercise of peremptories, the persistence and extensive use of which demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Id.* at 459–60 (cleaned up).

"While the time and manner of challenging and swearing jurors have traditionally rested within the sound discretion of the trial court, a trial court does not have the discretion to infringe upon a party's right to challenge any juror, either peremptorily or for cause, prior to the time the jury is sworn." *Lottimer v. N. Broward Hosp. Dist.*, 889 So. 2d 165, 166–67 (Fla. 4th DCA 2004) (cleaned up). "The right of peremptory challenge implies the right to make an intelligent judgment as to whether a juror should be excused." *Mitchell v. State*, 458 So. 2d 819, 821 (Fla. 1st DCA 1984).

A party "is entitled to consider the panel as a whole at any time that litigant has peremptory challenges remaining, and exercise those challenges at any time until the jury is sworn." *Fla. Rock Indus., Inc. v. United Bldg. Sys., Inc.*, 408 So. 2d 630, 632 (Fla. 5th DCA 1981). For

example, in *Florida Rock*, the Fifth District held that the trial court erred by disallowing a party with remaining peremptory challenges from exercising a "back-strike" of a prospective juror unless the party could show a "special reason." *Id.* 631–32.

The Florida Supreme Court has frowned upon jury selection practices that curtail a party's allowed number of peremptory challenges. In *Ter Keurst v. Miami Elevator Co.*, 486 So. 2d 547, 548–49 (Fla. 1986), the supreme court disapproved of a jury selection procedure that required the parties to exercise all of their peremptory challenges simultaneously in writing. Because both parties had exercised one peremptory against the same person, the trial court's procedure "denied one of the parties the right to exercise one of its peremptories." *Id.* at 549. Thus, our supreme court explained: "The only fair scheme is to allow the parties to exercise their challenges singularly, alternately, and orally so that, before a party exercises a peremptory challenge, he has before him the full panel from which the challenge is to be made." *Id.*

Additionally, the *Ter Keurst* court commented that a second infirmity existed in the trial court's procedure because the trial court failed to excuse prospective jurors who could not possibly have served after accounting for peremptory challenges, thereby preventing counsel from knowing which jurors would actually sit if not excused. *Id.* As our supreme court put it: "After challenges for cause are made, those excess persons over the number of needed jurors plus the number of allowable peremptories should be excused so that counsel may know who will serve if not excused." *Id.*

Nonetheless, the *Ter Keurst* court approved the result of the lower court's decision on preservation grounds: "We do not find this case to present fundamental error and, therefore, hold that the contemporaneous objection rule applies. The Ter Keursts would have had to object to the jury as finally composed to prevail on appeal." *Id.* at 550.

By contrast, in *Parker v. State*, 641 So. 2d 369, 373 (Fla. 1994), the Florida Supreme Court held that the trial court did not commit reversible error in requiring the parties to exercise their peremptory challenges simultaneously in writing, as the defendant failed to demonstrate any harm from the method where he made no claim "that either side was precluded from exercising all of the peremptories allotted to it."

No Florida case addresses the exact procedure used in this case. We agree with the well-reasoned opinions of two federal courts concluding that a defendant has no constitutional, statutory, or rule-based right to know

the identity of a replacement juror before exercising a peremptory challenge.

In *United States v. Blouin*, 666 F.2d 796 (2d Cir. 1981), the Second Circuit upheld a trial court's use of a "jury box" system that required the defendant to exercise his final two peremptory challenges without allowing a replacement juror to be drawn before the defendant exercised his last peremptory challenge. The defendant complained on appeal that "he was unduly restricted in his exercise of his [last] peremptory challenge by not knowing, before he used that challenge, the identity of the member of the array who would replace his [penultimate] challenge." *Id.* at 797.

The Second Circuit rejected this argument, holding that "the jury selection procedures did not deny Blouin any protected right" despite his being "obliged to exercise his last challenge before knowing the identity of two members of the twelve-person jury." *Id.* at 796, 799.

*Blouin* discussed the two basic approaches to jury selection, the "jury box" method and the "struck juror" method.

The "jury box" system "does not afford the opportunity, or the danger, of full comparative choice, for the parties do not know ahead of time who the replacement for a challenged juror will be" and thus "has the inherent disadvantage that each side must accept at least one juror whom he has not had an opportunity to challenge." *Id.* at 798.

By contrast, "the 'struck jury' system lets the parties make the most effective use of their challenges, in the sense that through their choices they are able to determine from the initial panel not only who will not serve but also who will serve as the petit jury." *Id.*

After discussing the differences in the two systems, the Second Circuit explained: "Blouin cannot succeed in his claim simply by showing that he could, under some procedure, have made more effective use of his peremptories. If that were the test, the 'struck jury' system would be required, for it affords a more 'effective' opportunity for the use of peremptories than the 'jury box' system." *Id.* at 798–99.

Similarly, in *United States v. Delgado*, 350 F.3d 520, 524 (6th Cir. 2003), the defendant argued that the trial court's chosen method—a "struck jury" system in which jurors were not seated in a sequence— "impaired the ability of defense counsel to exercise professional judgment when using peremptory challenges." The Sixth Circuit rejected this argument, holding that "the inability of defendants 'to make maximum

strategic use of their peremptory challenges' does not invalidate a district court's method of exercising peremptories." *Id.*

The "jury box" method discussed in *Blouin* is known as the "traditional jury box" method. A variation of the "jury box" method is the "sequential jury box" method, which is similar to the "struck jury" method because it allows the parties to know who will serve on the jury after they strike jurors. *See* Order Implementing a Variation of Traditional Jury Box Selection Method for Random Jury Selection, 15th Cir. (Mar. 27, 2024) (Shepherd, J.). In Judge Shepherd's order, she remarked that "[t]he Traditional Jury Box method is far superior at reducing the ability of parties to manipulate the racial composition of the jury." *Id.* This procedure for jury selection focuses the decision to exercise a preemptory challenge on the suitability of the individual juror under consideration.

Here, the trial court did not abuse its discretion in using a randomized "jury box" method in which peremptorily stricken jurors were replaced by the next randomly-drawn member of the venire. Contrary to Paul's suggestion that this was a "nontraditional procedure," this was actually the "traditional jury box" method.

Paul was not deprived of the opportunity to intelligently exercise his peremptory challenges. Peremptory challenges are a right of rejection, not a right of selection. No constitutional provision, statute, rule, or case law prohibits Florida courts from using the method of jury selection used in this case. The procedure for exercising peremptory challenges is traditionally within the sound discretion of the trial judge.

The randomized "traditional jury box" method used in this case was well within the trial court's discretion. Paul's right to "consider the panel as a whole" applied only when he had "peremptory challenges remaining," but he exercised all of his peremptory challenges before the jury was sworn. Paul's inability "to make maximum strategic use" of his peremptory challenges does not invalidate the trial court's chosen procedure for their exercise.

Unlike *Florida Rock* and *Ter Keurst*, the cases upon which Paul relies, the trial court's method of selection did not deprive Paul of any peremptory challenges. The trial court's method complied with the "fair scheme" contemplated by the Florida Supreme Court in *Ter Keurst* whereby each party is allowed "to exercise their challenges singularly, alternately, and orally so that, before a party exercises a peremptory challenge, he has before him the full panel from which the challenge is to be made." 486 So. 2d at 549 (emphasis added). Here, Paul had before him the full panel from

which each peremptory challenge was to be made at all times he had any peremptory challenges remaining.

To be sure, *Ter Keurst* also contains language suggesting that counsel should "know who will serve if not excused," which could be interpreted as inconsistent with the process used here. *See id.* Still, this language was dicta because the actual holding of *Ter Keurst* was that the issue was not preserved. *See id.* at 550. And the *Ter Keurst* court was not squarely confronted with the issue in this case—namely, the permissibility of using a traditional, randomized "jury box" system for jury selection in a criminal trial.

Recognizing that *Ter Keurst* could be read to support Paul's argument, we certify the following question to the Florida Supreme Court as being of great public importance:

> DOES *TER KEURST V. MIAMI ELEVATOR CO.*, 486 SO. 2D 547 (FLA. 1986), REQUIRE THAT A PARTY EXERCISING A PEREMPTORY CHALLENGE KNOW THE IDENTITY OF THE JURY PANEL MEMBER WHO WILL BE SEATED IF THE CHALLENGE IS EXERCISED?

### *The Prosecutor's Closing Argument was a Fair Rebuttal to the Defendant's Closing*

*The Closing Arguments*

During the State's initial closing argument, the prosecutor discussed the elements of the offenses and highlighted the eyewitness testimony, DNA evidence, and ballistic evidence that linked Paul to the crimes.

In the defense closing argument, counsel focused on the lack of evidence and conflicts in the evidence. Counsel mentioned various witnesses not called by the State, prompting the court to sustain objections. Counsel pointed out conflicts and inconsistencies in the testimony of the eyewitnesses. Counsel also highlighted the limitations of the DNA evidence, emphasizing the DNA analyst's testimony that DNA transfer can occur in various ways, multiple individuals' DNA was present on the firearm, and it could not be determined when or how the DNA was deposited—only that it was there. While counsel conceded that Paul was in the Hyundai, he insinuated that the Hyundai's other male occupant was the shooter or was just as likely to be the shooter. Counsel also criticized various aspects of law enforcement's investigation, including the failure to

13

obtain gunshot residue results and the swabbing of multiple parts of the firearm with a single swab.

During the State's rebuttal closing, the prosecutor suggested that there was no conflict in the evidence that Paul was the person who shot Senluis and Smalls:

> There is always going to be conflicts when you're dealing with humans. What we're dealing with is not whether there is a conflict in the time of day that it was, the weather outside, we're dealing with elements of a crime. . . .

> Is Carlos Senluis Francisco dead? Do you have a conflict of evidence of that? . . .

> The death was caused by the criminal act of Clarck Paul. Is there a conflict of evidence that the Defendant is the person that shot Carlos Senluis? Did someone come in here and tell you that it was not the Defendant?

> There was a premeditated killing of Carlos Senluis Francisco. Where is the conflict of evidence in that? The same goes for the murder [c]ount for Lamont Smalls.

> Do you have a conflict in the evidence that it was the Defendant who shot Lamont Smalls? Are there witnesses that had conflicting testimony—

Defense counsel timely objected to the prosecutor's closing, arguing that the prosecutor's remarks amounted to improper burden shifting and comments on Paul's silence. The trial court overruled the objection and denied the motion for a mistrial.

*Discussion*

A trial court's ruling on an objection to closing argument is reviewed for an abuse of discretion. *Moore v. State*, 701 So. 2d 545, 551 (Fla. 1997). Likewise, the denial of a motion for mistrial is reviewed for an abuse of discretion. *Veltre v. State*, 957 So. 2d 47, 50 (Fla. 4th DCA 2007).

"It is error for a prosecutor to make comments that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." *Cribbs v. State*, 111 So. 3d 298, 300 (Fla. 1st DCA 2013) (internal quotation

marks omitted). We have held that a prosecutor's "comment to the effect that no one took the stand to contradict the state's case" constituted "an improper comment, implicating the appellant's Fifth Amendment rights." *Henderson v. State*, 69 So. 3d 1022 (Fla. 4th DCA 2011). The purpose of this line of cases is to deter prosecutors from commenting on a defendant's failure to testify, which would undermine the force of the jury instruction concerning the Fifth Amendment right.

For example, in *Smith v. State*, 843 So. 2d 1010, 1011 (Fla. 1st DCA 2003), the First District held that a prosecutor's comment in closing— "Nobody testified he wasn't the guy"—constituted both improper burden shifting and an improper comment on the defendant's failure to testify. Likewise, in *Watts v. State*, 921 So. 2d 722, 724 (Fla. 4th DCA 2006), we held that the prosecutor's comment in closing, "Did you hear anybody else testify to dispute the officer's story?" was an impermissible comment on the defendant's failure to testify. Because only the officer and the defendant were present during the incident, and only the officer testified, the prosecutor's question could refer only to the defendant's failure to testify. *Id.*

Still, a prosecutor's otherwise improper comments may be permissible if they constitute a "fair reply" or an "invited response." Indeed, "the defense may invite a burden-shifting comment by the state." *Joyner v. State*, 979 So. 2d 1246, 1250 (Fla. 4th DCA 2008). The function of a prosecutor's rebuttal closing argument is to serve as "a reply to what has been brought out in the defendant's closing argument." *Brown v. State*, 243 So. 3d 1042, 1045 (Fla. 1st DCA 2018) (cleaned up). The law allows a prosecutor some latitude in discussing the evidence in rebuttal to respond to the defendant's characterization of the evidence in closing argument.

"A prosecutor's comments are not improper where they fall into the category of an 'invited response' by the preceding argument of defense counsel concerning the same subject." *Walls v. State*, 926 So. 2d 1156, 1166 (Fla. 2006). "Where defense counsel places an issue before the jury in closing argument, the prosecution is permitted to respond, and the defense may not be granted a new trial because the state rose to the bait." *State v. Ling*, 212 So. 3d 530, 533 (Fla. 1st DCA 2017) (internal quotation marks omitted).

For example, in *Austin v. State*, 700 So. 2d 1233, 1235 (Fla. 4th DCA 1997), we held that, in response to defense counsel's assertion in opening statements that the defendant did not throw a rock, the prosecutor "could lawfully respond that the defense argument is not what the evidence

15

shows, by reminding the jury that all of the testimony was to the contrary and that the victim's testimony was confirmed by the store owner who saw a man commit the offense." We added: "The state has a right, and even a duty, to respond to the defense's suggestion. To ignore it gives it credence." *Id.*

Here, the prosecutor's rebuttal comments were permissible as an invited response to defense counsel's arguments regarding conflicts in the evidence. By arguing that the eyewitness accounts were inconsistent and that the Hyundai's other male occupant was the shooter or was just as likely to be the shooter, defense counsel invited the State to remind the jury that there were no conflicts in the evidence as to the key issue of the shooter's identity. In other words, the State could fairly reply that there were no conflicts in the evidence that Paul was the person who shot Senluis and Smalls, as no one testified "that it was not the Defendant." Accordingly, the trial court did not abuse its discretion in denying the motion for mistrial.

We distinguish *Watts.* That case involved a two-witness roadside stop. 921 So. 2d at 924. We observed that "[w]here a total of two persons were present during the incident involved in this case, namely [the arresting officer] and [the defendant]," the prosecutor's offending comment "could refer only to Watts' failure to testify." *Id.* This was not a two-witness case. The prosecutor's statements in rebuttal are best understood as comments on the evidence presented, not as indirect references to Paul's failure to testify.

### *The Remaining Issues on Appeal*

We comment briefly on the remaining issues on appeal. The trial court did not abuse its discretion in admitting Paul's brief post-arrest statement. Additionally, the errors in failing to admit a witness's non-hearsay utterance and in failing to sustain objections to the DNA witness's mention of a peer review were harmless beyond a reasonable doubt.

This was a lengthy murder trial. The non-hearsay utterance was a minor point that was adequately explored by other evidence.

The DNA expert's bolstering of her testimony by mentioning a peer review was a minor blip in the trial. Defense counsel did not contest that Paul's DNA was found on the firearm. Defense counsel admitted that fact, but he argued its insignificance by suggesting that it did not prove Paul was the shooter due to the presence of multiple DNA contributors and the potential for DNA transfer. Defense counsel also conceded that Paul was

16

in the Hyundai and noted: "Three people drive the car, potentially their DNA is on the steering wheel."

Further, unlike a case where the reference to peer review was harmful because the handwriting experts' testimony was essentially the only evidence tying the defendant to the scene of the crime, *see Miller v. State*, 127 So. 3d 580, 586 (Fla. 4th DCA 2012), the DNA analyst's testimony was not as significant here. Three eyewitnesses identified Paul as the shooter of Smalls. Vanessa identified Paul as the shooter of Senluis and as the driver of the Hyundai during the high-speed chase. The ensuing manhunt culminated in the police finding Paul hiding in a truck camper near the location of the discarded murder weapon. There is no reasonable possibility that the isolated reference to a "peer review" affected the verdict. *See State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986).

Finally, as the State points out, Paul avoided the death penalty and received lesser convictions on two of the four charges, demonstrating that the jury was able to fairly weigh the evidence.

*Affirmed.*

CIKLIN and KUNTZ, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***